**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 4, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DARRAH R. WALCK,

     Petitioner - Appellee,

v.

W.A. DREW EDMONDSON,
Attorney General,

     Respondent,

     and

KURT SHIREY, Sheriff,
Pottawatomie County,

     Respondent - Appellant.

No. 05-6273

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 05-CV-430-R)**

---

Steven Michael Presson, Jackson & Presson, P.C., Norman, Oklahoma, for
Petitioner - Appellee.

Michael S. Ashworth, (John J. Foley, Assistant District Attorney, and Richard
Smotherman, District Attorney, with him on the briefs), Shawnee, Oklahoma, for
Respondent - Appellant.

---

Before **KELLY**, **LUCERO**, and **TYMKOVICH**, Circuit Judges.

**KELLY**, Circuit Judge.

_____

Respondent-Appellant Kurt Shirey, Sheriff of Pottawatomie County, appeals from the district court's judgment granting Petitioner-Appellee Darrah R. Walck's petition for habeas corpus pursuant to 28 U.S.C. § 2241. The judgment further ordered the State of Oklahoma to dismiss with prejudice pending first-degree manslaughter charges against Ms. Walck arising from a certain traffic accident and enjoined the State from retrying or further prosecuting her for the same incident. The district court held that further prosecution of Ms. Walck would violate the Double Jeopardy Clause because the state trial court previously granted a mistrial in her case after a jury was empaneled and two witnesses were heard. See Walck v. Edmondson, No. CIV-05-430-R, 2005 WL 1907347, at *6 (W.D. Okla. Aug. 10, 2005). Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we affirm the carefully considered judgment of the district court.

Background

This matter arises from a tragic traffic accident for which the driver, Ms. Walck, was charged with first-degree felony manslaughter. On December 28, 2003, following a night out with friends, Ms. Walck drove her vehicle in which Misty Moore, Clark Kincade and Lee Pena were passengers. Following close behind was a vehicle containing Jai Batson and Joe Smith, also Ms. Walck's

- 2 -

companions. After traveling on I-40 for a time, Ms. Walck and the trailing vehicle eventually exited and drove on Highway 177 in Pottawatomie County, Oklahoma. While en route on Highway 177, Ms. Moore, seated in the front passenger seat of Ms. Walck's vehicle, partially exited the vehicle in order to "flash"[1] Mr. Batson and Mr. Smith in the trailing vehicle. At some point thereafter, Ms. Walck lost control of her vehicle and an accident occurred, resulting in the death of Mr. Pena and injuries to the other three occupants. Following the accident, the hospital to which Ms. Walck was transported performed a blood test at the request of the Oklahoma Highway Patrol, which indicated that Ms. Walck had a blood alcohol level of 0.06.[2] On February 8, 2004, Ms. Walck was arrested and charged with first-degree manslaughter. See Okla. Stat. tit. 21 § 711(1).

The prosecution's theory of the case is that Ms. Walck, following Ms. Moore's "flashing" of the trailing vehicle, attempted to stand through the open sunroof of her vehicle to similarly "flash" the occupants of the trailing vehicle. The prosecution claims that Ms. Walck and Ms. Moore, at the time of the accident, were attempting to switch seats so that Ms. Moore could drive while Ms. Walck stood through the sunroof. Ms. Walck's proffered defense is that the

---

[1] To "flash" is to briefly expose a portion of one's body—typically intimate areas—to another.

[2] This is below the legal limit of 0.08 in Oklahoma. See Okla. Stat. tit. 47 § 11-902(A)(1).

- 3 -

fatal crash occurred when Ms. Moore grabbed, or attempted to grab, the steering wheel, causing the vehicle to veer out of control.

On May 26, 2004, the state trial court held a preliminary probable cause hearing during which the State called a number of witnesses. Most importantly for purposes of this appeal, Ms. Moore testified as to the events leading up to the fatal accident. In short, Ms. Moore testified that: Ms. Walck was driving the vehicle when it veered out of control, Aplt. App. at 103; Ms. Walck had consumed beer and shots of alcohol prior to the accident, id. at 101-02, 108-09; Ms. Moore never switched, or attempted to switch, seats with Ms. Walck, id. at 106-07; and Ms. Moore had indeed grabbed the steering wheel, but she did so several minutes before the crash, id. at 108, 112. The trial judge found probable cause to support the first-degree manslaughter charge and, following the grant of two continuances requested by Ms. Walck, the case proceeded to trial.

Trial commenced on January 12, 2005, and both the State and defense announced that they were ready to proceed. During voir dire, the prosecutor was informed that a medical emergency regarding one of its witnesses, Misti Moore, was developing and her presence at trial might be problematic. Notwithstanding, a jury was selected and sworn. The prosecution gave its opening statement, indicating to the jury that it would be calling witnesses Joe Smith, Jai Batson, Misti Moore, and Clark Kincade, who would establish that on the night in question all had gone to a bar in Oklahoma City and consumed alcohol, that while

in transit to another bar Ms. Moore "flashed" a trailing vehicle, that there were discussions about Ms. Walck doing the same even though she was driving, and that an accident ensued resulting in Mr. Pena's death. Id. at 139-40, 143-44. The defense countered in its opening that the accident only occurred because Ms. Moore, the passenger, grabbed the steering wheel. Id. at 146-47.

After opening statements the State called its first two witnesses—Mr. Batson and Mr. Smith. Following completion of Mr. Smith's testimony, the court took a recess, and it appears that during this time an off-the-record discussion regarding Ms. Moore's availability to testify occurred between the court and counsel. Id. at 198-99. Once the jury was brought back into the courtroom and the court had gone back on the record, the prosecution stated, "Your Honor, because of the unforeseen availability of Ms. Moore, we have to move for a mistrial." Id. at 199. The court in turn asked the defense if it had any objection, to which the defense replied that "we do not join in that motion, and we're ready to proceed." Id.

The court then addressed the jury, informing it that after the prosecution had completed its opening statement, the court had been informed that Ms. Moore, who was eight-and-a-half months pregnant, was en route to the hospital, but that the court had nonetheless continued with the case because it had hoped that the problem was "Braxton Hicks [contractions] or something other than delivery, and that she'd still be available . . . ." Id. at 200. The court further

explained that Ms. Moore was undergoing a cesarean section and would be unavailable to testify for at least three days. Id. Because, in the court's eyes, Ms. Moore was an important witness to both the prosecution and defense, and without her testimony the State could not put on its best case, a mistrial was declared. Id. at 201-02 ("[Ms.] Moore is a necessary witness . . . for you to understand the full facts of this case in order to be able to reach a decision."). In so doing, the trial court specifically noted that defense counsel "has indicated he objects to the mistrial . . . ." Id. at 201.

Subsequent to the jury being excused, Ms. Walck's counsel moved that the case be dismissed with prejudice on double jeopardy grounds. Id. at 203. The court denied the motion, reasoning that the State's motion for mistrial was not "based on prosecutorial misconduct in any way, shape, or form." Id. Counsel commented to no avail that Ms. Moore's preliminary hearing transcript was available in place of her live testimony and that the State had proceeded to trial knowing that Ms. Moore was eight-and-a-half months pregnant. Id. at 204-05. The trial court concluded the proceedings by ordering Ms. Walck to appear for trial on March 8, 2005. Id. at 205.

Before March 8 arrived, however, Ms. Walck filed an application to assume original jurisdiction, a petition for a writ of prohibition, and a request for stay of proceedings with the Oklahoma Court of Criminal Appeals (OCCA). While the OCCA initially granted a stay of proceedings, on March 28, 2005, it denied relief

and lifted the stay for the simple reason that Ms. Walck had "not met her burden of proof" in order for a writ of prohibition to issue. Id. at 239-40. On April 18, 2005, Ms. Walck filed an emergency petition for a writ of habeas corpus in the district court. See Aplee. Supp. App. at 62. The district court referred the matter to a magistrate judge, and ultimately adopted the well-reasoned report and recommendation of Magistrate Judge Bacharach, after resolving the State's objections. Thus, the district court granted the petition and ordered the pending criminal charge against Ms. Walck dismissed with prejudice on double jeopardy grounds. Walck, 2005 WL 1907347, at *6.

On appeal, the State argues that: (1) pursuant to Younger v. Harris, 401 U.S. 37 (1971), the district court should have abstained from intervening in Ms. Walck's pending state criminal trial; (2) 28 U.S.C. § 2254, rather than 28 U.S.C. § 2241, governs our review in this case; and (3) assuming we reach the merits of Ms. Walck's double jeopardy claim, there has been no violation of Ms. Walck's double jeopardy rights because there is no evidence of prosecutorial misconduct and the declaration of mistrial resulted from "manifest necessity."

Discussion

I. Abstention

The State first requests that we abstain from addressing Ms. Walck's double jeopardy claim. More concretely, the State submits that Ms. Walck failed

to demonstrate that her case constitutes one of the very narrow circumstances under which the Supreme Court has given the lower federal courts permission to intervene in ongoing state criminal proceedings. The district court disagreed and held that federal intervention was warranted. We review de novo the district court's abstention decision. See Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d 1160, 1163 (10th Cir. 1999).

Absent unusual circumstances, a federal court is not permitted to intervene in ongoing state criminal proceedings. Younger v. Harris, 401 U.S. 37, 54 (1971). The notion that state courts should remain free from federal court intervention derives from the limited nature of equity jurisdiction and the belief that our federal system operates most effectively when the states and their political subdivisions are left alone. Id. at 43-44. As a result, under Younger and its progeny, federal courts should not interrupt ongoing state criminal proceedings when adequate state relief is available.[3] Joseph A. v. Ingram, 275 F.3d 1253,

---

[3] There is some question as to whether Younger abstention is applicable where pretrial habeas relief, rather than equitable relief, is sought. See In re Justices of the Superior Court, 218 F.3d 11, 17-18 (1st Cir. 2000) (concluding that "the weighty federalism concerns implicated by the petition for writ of habeas corpus and by the district court's assertion of jurisdiction make pretrial federal adjudication of defendants' [habeas] claim inappropriate."); Carden v. Montana, 626 F.2d 82, 83-85 (9th Cir. 1980) (recognizing a general rule prohibiting pretrial habeas relief as a "logical implication of the abstention doctrine announced in Younger[]"). We need not decide the issue in this case, however, except to say that in those rare circumstances in which federal intervention is appropriate, such intervention is appropriate regardless of whether the remedy sought is an injunction or a writ of habeas corpus. We leave the issue of whether abstention as to one form of relief dictates abstention as to all forms of relief for another day.

1267 (10th Cir. 2002). More specifically, federal courts must abstain pursuant to Younger when: "(1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1215 (10th Cir. 2003); see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982). If these three conditions exist, absent extraordinary circumstances, abstention is mandatory. Crown Point, 319 F.3d at 1215.

We need not decide, however, whether the three conditions for mandatory abstention exist here because Ms. Walck's case presents an extraordinary circumstance warranting federal intervention. We have previously recognized that "[t]he Younger abstention doctrine is inapplicable . . . where irreparable injury can be shown." Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 876 (10th Cir. 2001); see also Perez v. Ledesma, 401 U.S. 82, 85 (1971). Additionally, a threat to an individual's federally protected rights constitutes irreparable injury where the threat "cannot be eliminated by . . . defense against a single criminal prosecution." Younger, 401 U.S. at 46.

Although we have not addressed the question of whether a threatened state prosecution in violation of the Double Jeopardy Clause is a circumstance

- 9 -

warranting federal intervention, we do not write on a clean slate. In <u>Abney v. United States</u>, 431 U.S. 651 (1977), the Supreme Court addressed whether a federal district court's pretrial order denying a motion to dismiss an indictment on double jeopardy grounds was an immediately appealable "final decision." <u>Id.</u> at 655-62. Holding that the denial of such a motion was immediately appealable, the Court explained:

> [T]he rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. . . . [T]his Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.
> . . .
> [T]he guarantee's protections would be lost if the accused were forced to "run the gauntlet" a second time before an appeal could be taken; even if the accused is acquitted, or, if convicted, has his conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit.

<u>Id.</u> at 660-61, 662.

In light of <u>Abney</u>, it is clear that federal intervention is justified where prospective state prosecutions run afoul of the Double Jeopardy Clause. This stems from the fact that the injury to an individual's double jeopardy rights engendered by an illegitimate successive retrial is no less irreparable simply because the prosecution comes under the guise of state, rather than federal, authority. <u>See</u> <u>Justices of Boston Mun. Court v. Lydon</u>, 466 U.S. 294, 303 (1984)

("[A] requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of his claim in federal court, would require him to sacrifice one of the protections of the Double Jeopardy Clause."). Without federal court intervention, Ms. Walck will be forced to "endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense" in violation of her constitutional rights. Abney, 431 U.S. at 661. And although notions of comity and federalism carry heavy weight in our system of government, such notions do not mean that the federal courts must sit idly by while "the rights conferred on a criminal accused by the Double Jeopardy Clause [are] significantly undermined." Id. at 660. We therefore hold that Younger abstention is unwarranted where a criminal accused presents a colorable claim that a forthcoming second state trial will constitute a violation of her double jeopardy rights.

II.    Standard of Review

The State next takes issue with both the district court's decision that 28 U.S.C. § 2241 applies to this case and the district court's subsequent use of a de novo standard of review. It maintains that because the state courts—namely, the trial court and the OCCA—reached the merits of Ms. Walck's double jeopardy claim, the more deferential standard of review contained within 28 U.S.C. § 2254(d) instead applies. This argument, however, is inconsistent with the language of 28 U.S.C. § 2254 and prior precedent.

In several instances, the language of § 2254 clearly indicates that its provisions are only operable as to a petition for habeas relief filed by "a person in custody pursuant to the judgment of a State court." See 28 U.S.C. § 2254(a), (b), (d), (e). While it is clear that Ms. Walck is currently "in custody," see Maleng v. Cook, 490 U.S. 488, 490-91 (1989), our prior cases have established that the somewhat ambiguous term "judgment of a State Court" within § 2254 refers only to conviction and sentence, see Dulworth v. Evans, 442 F.3d 1265, 1268 (10th Cir. 2006); McIntosh v. United States Parole Comm'n, 115 F.3d 809, 811 (10th Cir. 1997). The deferential standard of review contained within § 2254 is, therefore, only properly invoked when an individual in state custody collaterally attacks the validity of a state conviction and/or sentence. McIntosh, 115 F.3d at 811 ("[Section] 2254 . . . proceedings . . . are used to collaterally attack the validity of a conviction and sentence."); Braden v. 30th Judicial Cir. Ct., 410 U.S. 484, 503 (1973) (Rehnquist, J., dissenting) ("Section 2254 pertains only to a prisoner in custody pursuant to a judgment of conviction of a state court.").

The State's argument that § 2254 applies in this case because the trial court and the OCCA allegedly addressed the merits of Ms. Walck's double jeopardy claim misses the mark. Admittedly, a state adjudication on the merits of a particular claim is necessary in order for § 2254 deference to apply, see 28 U.S.C. § 2254(d); a state adjudication on the merits, in and of itself, however, is insufficient. Instead, what is needed in order for § 2254(d) to apply is a state

court adjudication on the merits of a claim challenging a state conviction and/or sentence brought forth by an individual in state custody. Despite the fact that the Oklahoma courts arguably addressed the merits of Ms. Walck's current claim, she is neither challenging a state conviction nor sentence and, as a result, § 2254 is inapplicable.

As the district court correctly pointed out, Ms. Walck is best described as a pretrial detainee. We have on numerous prior occasions, in unpublished dispositions, noted that a state court defendant attacking his pretrial detention should bring a habeas petition pursuant to the general grant of habeas authority contained within 28 U.S.C. § 2241. See, e.g., Green v. Whestel, 164 F.App'x. 710, 710-11 (10th Cir. 2006); Fuller v. Green, 112 F.App'x. 724, 725 (10th Cir. 2004); Gould v. Colorado, 45 F.App'x. 835, 837 n.1 (10th Cir. 2002). Moreover, several of our sister circuits have reached the same result in challenges to pretrial detention based specifically on double jeopardy grounds. See, e.g, Stow v. Murashige, 389 F.3d 880, 886-87 (9th Cir. 2004); Jacobs v. McCaughtry, 251 F.3d 596, 597 (7th Cir. 2001); Stringer v. Williams, 161 F.3d 259, 261-62 (5th Cir. 1998); Palmer v. Clarke, 961 F.2d 771, 772 (8th Cir. 1992). We agree and hold that § 2241 is the proper avenue by which to challenge pretrial detention, including when such challenges are based on double jeopardy grounds.

Section 2241's applicability greatly affects our standard of review in that the deference normally accorded state court judgments under § 2254 does not

- 13 -

apply. Instead, we review habeas claims made pursuant to § 2241, including Ms.

Walck's, de novo. See Binford v. United States, 436 F.3d 1252, 1253 (10th Cir.

2006); Ferry v. Gonzales, 457 F.3d 1117, 1131 (10th Cir. 2006).

III.    Double Jeopardy

We turn now to the merits of Ms. Walck's double jeopardy claim. The

State maintains that no double jeopardy violation is occurring or will occur

because there is no evidence of "impropriety on the part of the State or the trial

judge," Aplt. Br. at 41, the state trial judge's "manifest necessity" determination

is entitled to great deference, and the doctrine of "one continuing jeopardy"

applies in this case.

A state is prohibited from putting a criminal accused twice in jeopardy for

the same crime. Benton v. Maryland, 395 U.S. 784, 794 (1969). The primary

idea underlying this prohibition is that a state must not be permitted "to make

repeated attempts to convict an individual for an alleged offense, thereby

subjecting him to embarrassment, expense and ordeal and compelling him to live

in a continuing state of anxiety and insecurity, as well as enhancing the

possibility that even though innocent he may be found guilty." Green v. United

States, 355 U.S. 184, 187-88 (1957). Because, however, "[t]he prohibition is not

against being twice punished, but against being twice put in jeopardy," Ball v.

United States, 163 U.S. 662, 669 (1896), "it is not . . . essential that a verdict of

guilt or innocence be returned for a defendant to have once been placed in

- 14 -

jeopardy so as to bar a second trial on the same charge." Green, 355 U.S. at 188.

Rather, "in a jury trial jeopardy attache[s] when the jury is empaneled and

sworn." Crist v. Bretz, 437 U.S. 28, 38 (1978).

The Supreme Court has also stopped short of holding that "every time a

defendant is put to trial before a competent tribunal he is entitled to go free if the

trial fails to end in a final judgment." See Wade v. Hunter, 336 U.S. 684, 688

(1949). Instead, the Court has recognized "that a defendant's valued right to have

his trial completed by a particular tribunal must in some instances be

subordinated to the public's interest in fair trials designed to end in just

judgments." Id. at 689. Nevertheless, because a criminal defendant's right to

have his trial completed by a particular tribunal is substantial, and any mistrial

frustrates that right, the prosecution must overcome a heavy burden in justifying a

mistrial over the defendant's objection if the double jeopardy bar is to be avoided.

Washington, 434 U.S. at 505. That heavy burden is this: the prosecution must

demonstrate "manifest necessity" for any mistrial. Id.

It is abundantly clear, and the State does not appear to dispute the fact, that

Ms. Walck objected to, and was not complicit in, the mistrial declaration, which

occurred after the jury was empaneled and sworn.[4] See Aplt. App. at 199, 201.

_____

[4] Where a defendant requests or consents to a mistrial, there is no bar to
retrial unless the government acted in a manner intended to induce a request for
mistrial. United States v. Jorn, 400 U.S. 470, 485, 485 n.12 (1971) (Harlan, J.,
plurality op.); Earnest v. Dorsey, 87 F.3d 1123, 1128-29 (10th Cir. 1996).

- 15 -

Consequently, manifest necessity for the mistrial must be shown.

On multiple occasions, the Supreme Court has refused to adopt a mechanistic formula for the presence of "manifest necessity," see Wade, 336 U.S. at 691,[5] and has repeatedly reiterated that trial judges must be accorded broad discretion to declare a mistrial, see Gori v. United States, 367 U.S. 364, 368

[5] One commentator lists the factors relevant to the manifest necessity determination as follows:

> (1) the source of the difficulty that led to the mistrial—i.e., whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or were events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated for the purpose of giving the prosecution an opportunity to strengthen its case; (3) whether the possible prejudice or other legal complications created by the difficulty could be "cured" by some alternative action that would preserve the fairness of the trial; (4) whether the record indicates that the trial judge considered such alternatives; (5) whether any conviction resulting from the trial would inevitably be subject to reversal on appeal; (6) whether the trial judge acted during the "heat of the trial confrontation"; (7) whether the trial judge's determination rests on an evaluation of the demeanor of the participants, the "atmosphere" of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence presented by the prosecution prior to the mistrial suggested a weakness in the prosecution's case (e.g., a witness had failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual.

5 Wayne R. Lafave et al., Criminal Procedure § 25.2(c) n.18 (2d ed. 1999). While this list is non-exhaustive, it is demonstrative of the many considerations that govern a reviewing court's manifest necessity analysis.

(1961); United States v. Perez, 22 U.S. (9 Wheat.) 579, 579-80 (1824).  Most relevant to this case, the Court has passed on the propriety of a mistrial declaration based on an unavailable witness on three occasions.

First, in Downum v. United States, 372 U.S. 734 (1963), the Court confronted a situation in which the prosecution requested that the jury, already selected and sworn, be discharged because its key witness as to two counts of an eight count indictment could not be located.  Id. at 734-35.  The trial judge granted that request over the defendant's objection and the jury was dismissed.  Id. at 735.  Two days later, after a second jury was selected and sworn, the defendant pleaded double jeopardy, which was denied.  Id.  On writ of certiorari, the Court refused to adopt a per se rule that witness unavailability can never give rise to manifest necessity, id. at 737, but held that double jeopardy indeed barred retrial, noting that "[t]he discretion to discharge the jury before it has reached a verdict is to be exercised 'only in very extraordinary and striking circumstances.'"  Id. at 736 (quoting United States v. Coolidge, 25 F.Cas. 622, 623 (C.C.D. Mass. 1815) (Story, Circuit Justice)).  Central to the Court's conclusion was the fact that the missing witness was only pertinent to two of the eight charges and that "[t]he prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found."  Id. at 735; see also id. at 737.

Twelve years later, the Court further clarified, in a plurality opinion, the

circumstances under which manifest necessity arises as a result of witness unavailability.  See generally Jorn, 400 U.S. 470 (Harlan, J., plurality op.).  The government in Jorn pressed charges against the defendant for willfully assisting in the preparation of fraudulent income tax returns and, in support of its case, planned to call five taxpayers whom the defendant allegedly had aided in the preparation of fraudulent returns.  Id. at 472.  After the jury was selected and sworn, and the first of the five taxpayer witnesses was called, the trial judge became concerned that the witness had not been advised of his constitutional rights at the time he was contacted by the IRS, and therefore, refused to allow the witness to testify until he had consulted an attorney.  Id. at 472-73.  The trial court then inquired of the prosecuting attorney whether the other four prospective taxpayer witnesses were similarly situated, to which the prosecuting attorney responded that each of the four had been advised of their rights by the IRS upon initial contact.  Id. at 473.  The judge, being of the opinion that any such warnings were likely inadequate, discharged the jury, called the witnesses into court to inform them of their rights, and aborted the trial so the witnesses could consult with attorneys.  Id.  The case was then set for retrial before a different jury, but at the urging of the defendant, the trial court dismissed the charges on double jeopardy grounds.  Id.

On direct appeal, a plurality of the Court held that jeopardy had indeed attached and that the trial judge had abused his discretion in discharging the jury.

Id. at 486-87.  In so doing, the Court noted that "the . . . doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option [to have his trial completed by a particular tribunal] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."  Id. at 485.  Applying this standard, the Court came to the conclusion that "no consideration was given to the possibility of a trial continuance; indeed, the trial judge acted so abruptly . . . that, had the prosecutor been disposed to suggest a continuance, . . . there would have been no opportunity to do so."  Id. at 487.

The Court has found manifest necessity to exist because of witness unavailability in one, albeit extremely unique, circumstance.  Wade involved a situation in which two American soldiers attached to the 76th Infantry Division during World War II were arrested for the alleged rape of two local German women.  336 U.S. at 685-86.  Two days later, after the army had advanced twenty-two miles away from the site of the alleged incident, Wade and his co-defendant were put on trial before a general court-martial.  Id. at 686.  After hearing the evidence and closing the case, the court-martial reopened and continued the case until a later date so that testimony from previously unavailable witnesses could be heard before deciding the guilt of the accused.  Id.  A week later, the Commanding General of the 76th Division withdrew the charges, directing the court-martial to take no further action because "the 'tactical

situation' of his command and its 'considerable distance' from [the site of the alleged crime] made it impracticable for the Third Army to conduct the court-martial." Id. at 686-87. The charges were then transmitted to the Fifteenth Army and, despite Wade's double jeopardy objection, a trial and conviction followed. Id. at 687. On certiorari, after first noting that, just as in a civilian criminal trial, manifest necessity is required to prematurely halt a court-martial, id. at 690, the Court held that manifest necessity excused the potential double jeopardy violation because the "record [was] sufficient to show that the tactical situation brought about by a rapidly advancing army was responsible for withdrawal of the charges from the first court-martial." Id. at 691.

For a number of reasons, these cases lead us to conclude that Ms. Moore's absence did not give rise to manifest necessity. First, while the State has every right to consider Ms. Moore's testimony important, its argument that her live testimony was absolutely necessary proves too much. See Downum, 372 U.S. at 737 (noting specifically that the missing "witness was essential only for two of the six counts concerning petitioner"). The state trial judge in this case commented to the jury that "I'm of the opinion that Misty Moore is a necessary witness and her testimony is absolutely necessary in order for you to understand the full facts of this case . . . ." Aplt. App. at 201. Although the trial judge was in a better position than we to determine the importance of Ms. Moore's testimony, the facts before the trial court simply do not bear out that her testimony was

"absolutely necessary."

Ms. Moore was not the only occupant in Ms. Walck's vehicle at the time of the accident; in fact, Clark Kincade, who was available to testify at trial, was also in the vehicle at the time and his pretrial testimony considerably overlapped with Ms. Moore's. Both testified that Ms. Walck was at the wheel of the vehicle, that Ms. Walck had been drinking that evening, that Ms. Walck and Ms. Moore discussed switching seats so Ms. Walck could "flash" the trailing vehicle, and that sometime before the crash someone grabbed the steering wheel. Ms. Moore's and Mr. Kincade's pretrial testimony differed in only two significant respects: (1) Mr. Kincade claimed the accident occurred while Ms. Walck and Ms. Moore were attempting to switch seats and Ms. Moore claims no such switch ever occurred; and (2) Mr. Kincade claimed that someone (he did not know who) grabbed the steering wheel during the course of the accident and Ms. Moore admits she grabbed the steering wheel but claims this occurred several minutes before the accident.[6] These differences could have been brought to the jury's attention via the introduction of Ms. Moore's preliminary hearing testimony.[7] The differences

_____

[6] The State has not asserted that either Mr. Kincade's or Ms. Moore's testimony at trial was going to differ in significant respects from the testimony given at the preliminary hearing.

[7] The State argues, for the first time in its reply brief, that Ms. Moore's live testimony was necessary because Ms. Walck intended to introduce medical evidence indicating that Ms. Moore had used drugs on the night of the accident. This argument is waived, however, because the State failed to raise the issue in its opening brief. See Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624

certainly did not render Ms. Moore's testimony "absolutely necessary" "in order for [the jury] to be able to reach a decision." Id. In sum, Ms. Moore's live testimony was certainly not critical enough to require a mistrial.

Next, the prosecution proceeded to trial in the face of a known risk that Ms. Moore would be unavailable at trial. See Downum, 372 U.S. at 735; United States v. Stevens, 177 F.3d 579, 587 (6th Cir. 1999) ("[I]f the prosecutor had known before empaneling the jury that the key witness was ill, the Downum rule would apply because the prosecutor would knowingly have taken a chance by proceeding."). The prosecutor here was told prior to the completion of voir dire, and prior to the jury being sworn, that Ms. Moore was on her way to the hospital to deliver her child. See Walck v. Edmondson, No. Civ-05-430-R, 2005 WL 1356481, at *7 n.26 (W.D. Okla. June 7, 2005) (explaining that the prosecution's victim witness coordinator stated under oath that she informed the prosecutor during voir dire that "Ms. Moore was on her way to the hospital to deliver her child."). The prosecution must have known, and in fact admits to knowing,[8] that

_____

(10th Cir.1998). ("[A]rguments not set forth fully in the opening brief are waived."); Codner v. United States, 17 F.3d 1331, 1332 n.2 (10th Cir.1994). ("[W]e will not [address issues raised for the first time in a reply brief] on the merits."). Nonetheless, even if we were to address the State's argument, we are unpersuaded.

[8] In its objection to the magistrate judge's report and recommendation, the State admitted:

> The State, through its prosecutor John Foley ("Prosecutor" or "Foley"), was advised that a medical emergency was developing

- 22 -

Ms. Moore's presence at trial would be adversely affected. This case, then, is analogous to Downum, where the prosecutor knew that the government's key witness had not been located but nonetheless allowed a jury to be selected and sworn. See 372 U.S. at 735. The prosecutor here, like the prosecutor in Downum, proceeded in the face of a great risk of unavailability. Despite this great risk, the prosecution pushed on, and thus there was no manifest necessity.

Third, the purpose behind, or reason for, the mistrial was not significant enough to give rise to manifest necessity. See Illinois v. Somerville, 410 U.S. 458, 464-65 (1973); Wade, 336 U.S. at 691; United States v. Crotwell, 896 F.2d 437, 440 (10th Cir. 1990) (considering important the fact that the trial judge declared a mistrial "solely on the basis of his concern for judicial economy"). The most obvious purpose for the mistrial in this case—that Ms. Walck's trial be held at a time when the jury could hear from all witnesses, including Ms. Moore—is rather innocuous. The trial judge explained to the jury, however, that he was going to have to call a mistrial because "to force the State to go forward with [its] case without [its] witness . . . would put [it] at a severe disadvantage . .

---

> with Moore regarding her pregnancy and that her presence at trial might be adversely affected. At approximately 11:00 a.m., Foley immediately advised both the Trial Court and counsel for [Ms. Walck] of the medical matters potentially affecting Moore's ability to attend trial. This discussion occurred prior to the jury being sworn to try the cause at issue.

Aplee. Supp. App. at 43 (emphasis in original).

. .” Aplt. App. at 201. The trial judge also added that without Ms. Moore's testimony the State "may not be able to put forward the best evidence that they [sic] have." Id. These reasons resemble the type we have been instructed to view using the "strictest scrutiny." See Washington, 434 U.S. at 508 ("[T]he strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence . . . ."). Nonetheless, while there will inevitably be situations where witness unavailability—even where precipitated by events less pressing than an advancing army—gives rise to manifest necessity, the reasons given for the mistrial here are insufficient.

Finally, prior to discharging the jury, the state trial judge did not sufficiently consider the viable and reasonable alternatives to a mistrial. See Jorn, 400 U.S. at 487 (Harlan, J., plurality op.); United States v. Rivera, 384 F.3d 49, 56 (3d Cir. 2004) ("Critically, a mistrial must not be declared without prudent consideration of reasonable alternatives."). We agree with Ms. Walck that, at the very least, the trial judge should have considered reading Ms. Moore's preliminary hearing testimony to the jury or, in the alternative, granting a continuance until Ms. Moore was available as a witness. See Aplee. Br. at 15-16. Where a declarant "[i]s unable to . . . testify at the hearing because of . . . then existing physical . . . illness or infirmity . . .[,]" Okla. Stat. tit. 12 § 2804(A)(4), Oklahoma law sanctions the use of "[t]estimony given as a witness . . . in a deposition taken . . . in the course of the same . . . proceeding, if the party against

- 24 -

whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination," id. at § 2804(B)(1); see also Crawford v. Washington, 541 U.S. 36, 53-54 (2004). Clearly, then, either the prosecution or Ms. Walck could have utilized Ms. Moore's preliminary hearing testimony at trial. As previously discussed, Mr. Kincade could have covered much of the ground to be covered by Ms. Moore's testimony; but, any gaps or inconsistencies in their respective stories could have been sufficiently filled and highlighted using Ms. Moore's preliminary hearing testimony. Oklahoma law, like federal law, allows prior sworn testimony of unavailable witnesses to be read to the jury, and no one disputes that Ms. Moore was unavailable given her serious emergency surgery and hospitalization. Okla. Stat. Ann. tit. 12, §§ 2804(A)(4) & (B)(1). The state trial judge considered this option at Ms. Walck's urging, but not until a mistrial had already been declared and the jury dismissed. See Aplt. App. at 204. The trial judge also failed to consider the option of granting a continuance until Ms. Moore had recuperated from her surgery and was again available to testify.[9] Because the trial judge did not consider the foregoing viable alternatives, manifest necessity did not require a mistrial.

---

[9] As the magistrate judge correctly noted, "A 2 1/2 day extension would have ended the week; and the following Monday, the courthouse was closed for Martin Luther King, Jr.'s birthday." Walck, 2005 WL 1356481, at *7 n.24. This would have given Ms. Moore 5 1/2 days to recuperate from her C-section prior to testifying. Id. at *7.

The State's persistent approach to this case—focusing primarily on the fact that there is no indication of judicial or prosecutorial misconduct—is much too narrow. Such an approach runs head-on into the Court's repeated admonition that the Double Jeopardy Clause protects against more than prosecutorial or judicial overreaching. See Jorn, 400 U.S. at 484 (Harlan, J., plurality op.) ("[R]ecognition that the defendant can be reprosecuted for the same offense . . . does not compel the conclusion that double jeopardy policies are confined to prevention of prosecutorial or judicial overreaching."); Downum, 372 U.S. at 736 ("Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches. But those extreme cases do not mark the limits of the guarantee.") (internal citations omitted). Granted, our analysis here would be even more straightforward were there evidence of prosecutorial or judicial misconduct, but the absence of such evidence is not fatal to Ms. Walck's double jeopardy claim. Instead, we look to whether manifest necessity existed to support the declaration of a mistrial prior to the completion of trial, and here we hold there was an absence of manifest necessity.

The State also places much emphasis on the deference accorded trial judges in determining whether manifest necessity exists. Simply arguing for deference, in and of itself, however, is insufficient to demonstrate why such deference should insulate a trial judge's manifest necessity determination in an individual

case. In other words, the State has failed to put forward sufficient reasons for why Ms. Moore's temporary absence necessitated the deprivation of Ms. Walck's interest in facing the perils of a criminal trial only once; and, after all, the burden of demonstrating manifest necessity falls on the prosecution. See Washington, 434 U.S. at 505 ("[T]he prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar."). Accordingly, in spite of the deference we must grant the state trial judge, the declaration of a mistrial in this case was unwarranted.

In a last-ditch effort to avoid the double jeopardy bar, the State invokes the "continuing jeopardy" doctrine. That doctrine holds "that the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." See Richardson v. United States, 468 U.S. 317, 325 (1984). We have previously instructed that:

> The question of whether jeopardy has objectively "terminated" should be analyzed in terms of the policies of the Double Jeopardy Clause, namely its concern that repeated trials may subject a defendant to embarrassment, expense and ordeal and compel him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. Jeopardy may be said to have terminated only when the posture of a trial in some objective sense leaves that defendant in such a position that resumption of proceedings would implicate those policies.

United States v. Shinault, 147 F.3d 1266, 1276 (10th Cir. 1998) (quoting Lydon, 466 U.S. at 320 (Brennan, J., concurring in part and concurring in the judgment)) (emphasis in original). The mistrial declaration in this case patently implicates

the policies of the Double Jeopardy Clause. Ms. Walck's trial was discontinued after the jury had been sworn and two witnesses had been heard, and thus, as previously explained, retrial would indeed subject her to the embarrassment, expense, and ordeal of a second trial. Suffice it to say that the mistrial declaration in this case was a terminating event and thus the "continuing jeopardy" doctrine is inapplicable.

AFFIRMED. Ms. Walck's pending motion to dismiss the appeal is DENIED as moot.