**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

TERRY J. MCINTYRE, JR., a/k/a T-Mac,
a/k/a Florida,

      Defendant - Appellant.

Nos. 08-3304 & 09-3173
(D.C. No. 2:06-CR-20047-CM-JPO-3)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **GORSUCH**,
Circuit Judge.

---

Following a second trial, Terry J. McIntyre, Jr. was convicted of various offenses

arising out of his involvement in a drug distribution conspiracy in Lawrence, Kansas.

Prompted by what it concluded to be manifest necessity, the district court declared a

mistrial during his first trial after his counsel reported that a former client might have

purchased drugs from McIntyre and his co-defendants and might be called to testify.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

McIntyre later moved to dismiss the indictment which formed the basis of the second trial on double jeopardy grounds. The court denied the motion, again concluding the mistrial was warranted by manifest necessity. McIntyre appeals from that decision and also from the court's denial of his pre-trial motion to suppress. We affirm.

## I.    BACKGROUND

In May 2005, the Lawrence Police Department obtained information from a confidential informant (CI) regarding crack cocaine dealers in Lawrence, Kansas. The CI assisted the police in ten controlled purchases. Upon further investigation, the police identified McIntyre and his co-defendants as belonging to a group of drug dealers known as the "Blue Crew." (R. Vol. II at 47.) The police also obtained evidence against McIntyre during a traffic stop on September 28, 2005, which was unrelated to the larger investigation. On March 31, 2006, McIntyre was charged, along with four other defendants, in a seventeen-count indictment. Specifically, McIntyre was charged with seven counts relating to his involvement in distributing crack cocaine from 2004 to 2006. Zachary L.K. Williams and Johnnie K. Williams, III, were charged in the same indictment and were tried jointly with McIntyre.

A. Motion to Suppress

Prior to the first trial, McIntyre filed a motion to suppress evidence from the September 28, 2005 vehicle stop arguing Officer Branson Star lacked reasonable suspicion for the stop. Star testified to the following at the suppression hearing.

At approximately 2:30 a.m. on September 28, 2005, he was on routine patrol when he observed a vehicle "moving very slowly through the parking lot [of a hotel] with its

[head]lights off." (R. Supp. Vol. I at 49.) He thought the vehicle "was suspicious" and decided he "needed to investigate." (*Id.* at 47, 49.) He turned his patrol car around and observed the vehicle, now with its lights on, pull out of the hotel parking lot. As he pulled up to the vehicle, he observed two people inside, neither of whom turned towards him; they continued on their way.

Star followed. He ran a registration check and learned the vehicle was not listed as stolen and was registered to Deborah Garrett at a local address. He knew two of Garrett's relatives—"a son [and a] nephew"—had previously been involved in "[g]uns, drugs, other crimes, alcohol-related crimes." (*Id.* at 51.) He was suspicious because the vehicle was associated with these individuals and was located at a hotel, even though it was registered locally. According to Star, automobile burglaries and narcotic-related activity frequently take place at hotels and he had been involved in a number of investigations involving hotels. More specifically, he had been involved in a drug investigation at this particular hotel involving one of the co-defendants in this case, Michael Beal, just a few month earlier. Star "made the decision to stop the vehicle" because he wanted to "identify the occupants" and "see if their story was plausible for driving through the parking . . . lot with no lights on . . . ." (*Id.* at 52-53.)

After gathering the above information, Star stopped the vehicle approximately six blocks from the hotel. He approached the driver's side door and asked the driver and passenger for their identification. The passenger stated he had no identification but said his name was Terry McIntyre. The officer explained why he stopped the vehicle. He then walked to the passenger side of the car to ask McIntyre for his personal information.

During that interaction, Star observed "a white substance wrapped in plastic between [McIntyre's] legs." (*Id.* at 57.) He believed the substance to be crack cocaine so he waited until another officer arrived and then asked McIntyre to step out of the vehicle and placed him under arrest. McIntyre volunteered that there was a gun in his pocket. The officers recovered the weapon, a package of a white substance and $620 in cash from McIntyre's person. From the vehicle, they recovered a digital scale and two bags containing a white powder. All of the bags were found to contain cocaine.

After hearing this evidence and considering the arguments of counsel, the court denied McIntyre's motion to suppress concluding "Officer Star acted reasonably in stopping [McIntyre]." (*Id.* at 129.)

B. First Trial

McIntyre's first trial commenced on April 1, 2008. He was tried along with two co-defendants, Zachary Williams and Johnnie Williams. On the sixth day of trial, April 10, 2008, McIntyre's counsel, Jacquelyn Rokusek, advised the court she had withdrawn from representing Stephen Barbee in another case.[1] Rokusek had contacted the government approximately six weeks prior to trial to ask whether there was a conflict of interest arising out of her representation of both McIntyre and Barbee. The government stated it was not aware of any conflict and Barbee apparently advised Rokusek he was not familiar with any of the individuals involved in this case. Rokusek later learned both cases involved the same CI and Barbee's phone number appeared on phone records in

---

[1] At this point, the jury had heard the testimony of five prosecution witnesses and 118 exhibits had been admitted into evidence.

this case, indicating he may have purchased drugs from the Blue Crew.

Rokusek informed the court she had contacted the Kansas Disciplinary Administrator's Office who advised her she had a conflict as to her representation of Barbee but not as to McIntyre. According to Rokusek, she told McIntyre about the potential conflict; nevertheless, he wanted her to continue to represent him. The government was not satisfied McIntyre could waive the conflict and expressed concern that Rokusek might be a witness based on the apparently conflicting statements given to her by Barbee. After further questioning by the court, Rokusek acknowledged McIntyre might not be able to waive the conflict of interest. She stated: "I can't tell you definitively that . . . it would be a knowing and intelligently made waiver, simply because I'm limited in what I can discuss with [McIntyre] regarding this issue as it is protected by the attorney/client privilege, my conversation with my other client." (*Id.* at 732.)

The court asked counsel to submit briefs regarding whether there was a basis for a mistrial as to McIntyre and, if so, how that would affect his co-defendants, the Williams brothers. The court stated it was "leaning towards" finding a mistrial and asked counsel to state whether they believed there were any alternatives. (R. Vol. II at 752.) Rokusek requested the court "order that the government be prohibited from calling Mr. Barbee as a witness in this case" so that "no conflict would exist." (*Id.* at 753.) Counsel for the co-defendants and the government suggested three other alternatives: (1) obtaining a waiver of attorney/client privilege from Barbee; (2) severing McIntyre from the trial and proceeding against the Williams brothers; and (3) delaying the trial for 30 to 60 days to allow a new attorney to represent McIntyre.

On April 14, the court proposed its ruling and then asked the attorneys to state any objections on the record. It concluded Rokusek could not proceed as McIntyre's counsel because there was an actual conflict of interest regarding her representation of McIntyre and "a wavier could not cure the present problems" because McIntyre "is unable to give a knowing waiver." (*Id.* at 789-90.) It then said: "In considering whether declaring a mistrial is appropriate, this court uses discretion to determine whether such declaration is compelled by manifest necessity. Federal Rule of Criminal Procedure 26.3 requires this court to solicit alternatives from counsel before ordering a mistrial." (*Id.* at 790.)

The court considered—and rejected—each of the alternatives counsel proposed. It rejected the alternative of prohibiting Barbee from testifying because Barbee "may serve as a witness for the government or for [co-]defendants" and "[t]he court will not prohibit the other defendants from calling witnesses that may have potentially beneficial information." (*Id.* at 791.) In addition, the court noted "[t]his alternative [prohibiting Barbee from testifying] does not solve the problem that Miss Rokusek may have learned information related to the confidential informant through her representation of Mr. Barbee, and may therefore be unable to effectively cross-examine the confidential informant." *Id.*

Because the court concluded "there [were] no viable alternatives to remedy the problems created by Miss Rokusek's conflict" it held "a mistrial for Terry McIntyre [was] a manifest necessity." (*Id.* at 793.) It declared mistrials as to all defendants,

- 6 -

overruling the objections of all three.[2] Rokusek again requested the court prohibit Barbee

from testifying at trial. It overruled the objection and announced its final ruling:

> First, the court finds that Miss Rokusek has an unwaivable conflict of
> interest. Miss Rokusek is unable to continue to represent defendant Terry
> McIntyre in this trial. Requiring defendant Terry McIntyre to proceed
> without counsel or with new counsel would significantly hinder his Sixth
> Amendment right . . . to effective assistance of counsel and his right[] to a
> fair trial. Without any viable alternatives, the court finds a mistrial for
> defendant Terry McIntyre necessary. Second, because defendant Terry
> McIntyre cannot proceed in the current trial, the court severs his trial from
> the remaining defendants. Third, [the] court finds that the resulting trial
> could also violate the rights of defendant Johnnie Williams and defendant
> Zachary Williams. Without any viable alternatives, the court finds that
> mistrials for defendants Johnnie Williams and Zachary Williams are
> necessary.

(*Id.* at 811-12.)

C. <u>Motion to Dismiss and Second Trial</u>

The government filed a third superseding indictment on April 24, 2008, which

expanded the time period for the conspiracy and alleged two additional counts against

McIntyre.[3] McIntyre moved to dismiss the indictment based on double jeopardy. After a

hearing the court denied the motion, explaining "it went to great lengths to discover and

evaluate all possible options for continuing [the first trial]." (R. Supp. Vol. II at 59.)

"[T]here was no bad faith or intent to deceive on the part of the government." (*Id.* at 60.)

It "considered . . . carefully" the option of prohibiting Barbee from testifying but

---

[2] McIntyre's rights are not co-extensive with the rights of Zachary Williams and Jonnie Williams. Rokusek's representation of Barbee affected McIntyre and his co-defendants in different ways. The Williams brothers have filed separate appeals, each challenging, *inter alia*, the necessity of a mistrial. We do not consider whether the mistrial was warranted as to them.

[3] McIntyre does not complain about the broadened scope of this indictment.

concluded it was not "a viable alternative." (*Id.*) The court "affirm[ed] its finding that a mistrial for Terry McIntyre was a manifest necessity." (*Id.* at 61.)

McIntyre's second trial commenced in November 2008. He was tried with Zachary Williams and Johnnie Williams. The jury convicted him of nine of ten counts;[4] the court sentenced him to 322 months imprisonment. He moved for a new trial which the court denied. He appeals from his conviction and sentence complaining of the denial of (1) his motion to dismiss and (2) his motion to suppress.[5]

## II. DISCUSSION

A. <u>Motion to Dismiss</u>

"When a mistrial has been declared, the Double Jeopardy Clause precludes a retrial of the defendant unless the defendant consented to the mistrial, or unless the mistrial was compelled by manifest necessity." *United States v. Crotwell*, 896 F.2d 437, 439 (10th Cir. 1990) (quotations, citation and footnote omitted). The district court concluded the mistrial was compelled by manifest necessity. We review this decision for an abuse of discretion. *United States v. Powell*, 982 F.2d 1422, 1429 (10th Cir. 1992). "[T]he Supreme Court has refused to adopt a mechanistic formula for the presence of manifest necessity, and has repeatedly reiterated that trial judges must be accorded broad discretion to declare a mistrial." *Walck v. Edmondson*, 472 F.3d 1227, 1236 (10th Cir.

---

[4] Barbee did not testify in the second trial.

[5] On October 30, 2008, McIntyre appealed from the district court's denial of his motion to dismiss the third superseding indictment. His appeal was assigned Case No. 08-3304. It was abated on December 2, 2008. McIntyre appealed from the final judgment on June 17, 2009. On June 26, 2009, the order abating his appeal was vacated. His current appeal (Case No. 09-3173) has been consolidated with his prior appeal.

2007) (quotations and citations omitted). In considering whether a mistrial resulted from manifest necessity, we generally consider many factors,[6] but we focus our discussion here on McIntyre's arguments.

McIntyre contends the mistrial was not compelled by manifest necessity because the court could have proceeded with the trial if it had simply prohibited Barbee from testifying. We can certainly consider whether the possible prejudice created by Rokusek's representation of Barbee could be "cured" by some action other than a mistrial

[6] One commentator has listed the factors relevant to the manifest necessity determination as follows:

(1) the source of the difficulty that led to the mistrial—*i.e*., whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or were events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated for the purpose of giving the prosecution an opportunity to strengthen its case; (3) whether the possible prejudice or other legal complications created by the difficulty could be "cured" by some alternative action that would preserve the fairness of the trial; (4) whether the record indicates that the trial judge considered such alternatives; (5) whether any conviction resulting from the trial would inevitably be subject to reversal on appeal; (6) whether the trial judge acted during the "heat of the trial confrontation"; (7) whether the trial judge's determination rests on an evaluation of the demeanor of the participants, the "atmosphere" of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence presented by the prosecution prior to the mistrial suggested a weakness in the prosecution's case (*e.g*., a witness had failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual.

*Walck*, 472 F.3d at 1236 n.5 (quoting 5 Wayne R. Lafave et al., Criminal Procedure 25.2(c) n.18 (2d ed. 1999).

and, if so, whether the trial judge considered such alternative. *See supra* n.6. Here, Rokusek raised the alternative of prohibiting Barbee from testifying before the district court but the court rejected it because it did not want to prohibit McIntyre's co-defendants from calling Barbee as a witness. Notably, Rokusek advised the court she "was wanting to call [Barbee] as a witness in this case because I felt there was exculpatory information . . . ." (R. Vol. II at 716.) Even if the court had prohibited Barbee from testifying, it would not have solved the problem regarding Rokusek's continued representation of McIntyre. The court concluded she had a conflict of interest that McIntyre could not waive because she could not tell him what she learned from Barbee. Thus, McIntyre would have had to proceed with new counsel, following a delay of sufficient length to allow the new counsel to become familiar with the case. This would have presented a significant hardship to the jury, who was originally advised the trial would last four to six weeks. We have explained, in a similar context: "[T]he court was not required to accept a solution which remedied only one of the problems or offered temporary relief." *United States v. Calabrese*, 645 F.2d 1379, 1383 (10th Cir. 1981).

McIntyre argues "[t]he government caused the situation leading to the mistrial." (Appellant's Br. at 17.) If this were true, it would certainly factor into our analysis. *See supra* n.6. But it is not. The court specifically found the government did not act in bad faith in failing to inform Rokusek of Barbee's involvement prior to trial and we see no reason to doubt that finding. Indeed, McIntyre's counsel conceded at oral argument that there was no bad faith here. McIntyre also contends the mistrial was "prematurely . . . granted" because Barbee was never actually called as a witness. (*Id.*) This argument

- 10 -

ignores the court's conclusion that Rokusek could not continue to represent McIntyre because McIntyre could not waive the conflict of interest.

McIntyre relies on *Walck* to support his position. In *Walck*, the state trial court declared a mistrial over the defendant's objection when a key witness went into early labor and was taken to the hospital to deliver her child after the jury was sworn and heard testimony. 472 F.3d at 1231. We affirmed the district court's grant of the defendant's petition for habeas relief because we concluded "[the witness's] absence did not give rise to manifest necessity." *Id.* at 1238. We explained: (1) her testimony was not "absolutely necessary;" (2) "the prosecution proceeded to trial in the face of a known risk that [the witness] would be unavailable at trial;" (3) the reason for the mistrial—witness unavailability—"was not significant enough to give rise to manifest necessity;" and (4) "the state trial judge did not sufficiently consider the viable and reasonable alternatives to a mistrial." *Id.* at 1238-40.

Here, we are not reviewing a case of witness unavailability but instead, a case involving a conflict of interest between an attorney and a client. Thus, the first three considerations factoring into our decision in *Walck* are inapplicable here. And, unlike in *Walck*, the court here asked the parties to suggest alternatives to a mistrial, as required by Rule 26.3 of the Federal Rules of Criminal Procedure.[7] A more analogous case is *Calabrese*, 645 F.3d 1379.

---

[7] Fed. R. Crim. P. 26.3 states: "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."

In *Calabrese*, the trial court sua sponte granted a mistrial as to all defendants after counsel for one of the co-defendants attempted to impeach a government witness by inquiring whether the witness had lied in an affidavit filed in an earlier criminal proceeding. "[T]he [same] attorney had represented the witness in the earlier proceeding and had prepared the affidavit he was using for impeachment." *Id.* at 1382. We held the district court did not err in denying the defendant's motion to dismiss the second indictment on double jeopardy grounds because the mistrial was compelled by manifest necessity. We explained:

> The court below was confronted with a kaleidoscope of problems, including a possible violation of the attorney-client privilege, the attorney's role as both an advocate and a witness in the proceedings, and a controversy over the ethical propriety of the attorney's prior representation of the witness.

*Id.* at 1383. We noted "the mistrial declaration was not caused by prosecutorial or judicial overreaching." *Id.*

The district court here was presented with a similar "kaleidoscope of problems" and its decision to grant a mistrial did not result from "prosecutorial or judicial overreaching." It considered various alternatives to declaring a mistrial and, after thorough consideration, concluded none were viable. Like the district court in *Calabrese*, the trial court here acted with the principal goal of protecting the interests of McIntyre and his co-defendants. In light of the "broad discretion" afforded trial judges to declare a mistrial, *see Walck*, 472 F.3d at 1236, we conclude the court did not abuse its discretion in denying McIntyre's motion to dismiss.

- 12 -

B.    Motion to Suppress

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment."  *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004).

> In assessing the constitutionality of an investigatory stop, we ask whether the circumstances demonstrate that law enforcement officers had reasonable suspicion that criminal activity may have been afoot.  In making this determination, we look at the totality of the circumstances to determine whether a particularized and objective basis, viewed from the standpoint of an objectively reasonable police officer, existed for suspecting legal wrongdoing.

*United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008) (citations omitted).

McIntyre contends the district court erred in denying his motion to suppress only because "there [was] . . . insufficient evidence of potential criminal activity . . . ." (Appellant's Br. at 24.)  He argues: "Driving without headlights for a few seconds at most does not qualify as even a minimally objective justification for a stop."  (*Id.*)  However, he also acknowledges—as he must—that Star did not stop the vehicle in which he was traveling solely because he observed it being driven without headlights.  Star also reasonably suspected criminal activity because the vehicle was traveling through the parking lot of a hotel at 2:30 a.m. even though it was registered to an individual with a local address—an individual whose relatives had been involved in "[g]uns, drugs, other crimes, alcohol-related crimes."  (R. Supp. Vol. I at 51.)

Based upon his law enforcement experience, Star suspected the vehicle might have been involved in an automobile burglary or drug-related activity.  Tellingly, he had been

- 13 -

involved in a drug investigation—involving one of McIntyre's co-defendants—at the same location only a few months prior to this stop. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The stop here occurred in an area of expected criminal activity; a factor relevant to the reasonable suspicion analysis. *See id.*

McIntyre argues there may have been an entirely innocent explanation for the conduct observed by Star. Though possibly true, it does not negate a finding of reasonable suspicion. "[O]fficers are permitted . . . to draw inferences and make deductions that might well elude an untrained person." *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994) (quotations omitted).

> In analyzing whether a given set of factors gives rise to the requisite reasonable suspicion, we . . . must be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances.

*Lopez*, 518 F.3d at 797 (quotations omitted). Viewed under this standard and accepting the trial court's factual findings, we agree Star had reasonable suspicion to stop the vehicle. The court did not err in denying McIntyre's motion to suppress.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

- 14 -