**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SAUL SOTO,

      Defendant - Appellant.

No. 03-2176

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-02-1595-MCA)**

---

Todd Hotchkiss of Frechette & Associates, P.C., Albuquerque, New Mexico, for Defendant - Appellant.

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **EBEL** , **HENRY** , and **HARTZ** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

    Defendant Saul Soto conditionally pleaded guilty to conspiracy to possess

with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(B) and 846. He now appeals the district court's denial of his motion to suppress cocaine found in the truck he was driving and statements he made following his arrest. He contends that his arrest was not supported by probable cause and that his subsequent consent to search the truck was tainted by that illegal arrest. Concluding that the officers had probable cause to arrest Defendant, we affirm.

## I.    BACKGROUND

We view the evidence in the light most favorable to support the district court's ruling. *See United States v. Toro-Pelaez*, 107 F.3d 819, 824 (10th Cir. 1997). On August 16, 2002, Albuquerque Police Department (APD) Officer Art Lucero received a telephone call from a Drug Enforcement Agency (DEA) agent who was looking for a Spanish-speaking officer to participate in an undercover operation involving the purchase of two kilograms of cocaine. Officer Lucero informed the agent that he spoke Spanish and that the individual selling the cocaine could call him on his cellular phone. About 20 to 30 minutes afterward, Officer Lucero received a call from the individual, Joel Marquez. Later that day Marquez called again, and Officer Lucero agreed to meet him at a gas station in Albuquerque to purchase the cocaine. Marquez told Officer Lucero that he would be driving a white Ford pickup.

Officer Lucero then arranged for other law enforcement officers to set up surveillance at the gas station and told them to look for the pickup. Although Marquez had not mentioned that another vehicle would be involved, the officers planned to keep an eye out for one, particularly because of the possibility of counter-surveillance. At the suppression hearing one of the surveillance officers, DEA Agent Mickey Teague, testified based on his training and experience that in fairly large drug transactions (such as those involving two kilograms of cocaine) drug traffickers often set up such counter-surveillance to ensure that they are not being watched by law enforcement officers. He also testified that drug traffickers frequently negotiate in one vehicle and store the drugs in another vehicle to reduce their risk.

Surveillance officers at the gas station observed a blue pickup enter the gas station parking lot, circle the lot slowly, and then leave. Shortly thereafter, a white Ford pickup truck entered the lot, similarly circled a couple of times, and parked in a hotel parking lot next to the gas station parking lot. At some point the blue pickup returned and parked in the gas station lot, but away from the pumps, about 100 yards from the white truck. The occupants of the blue truck (who had an unobstructed view of the white truck) did not leave their vehicle to conduct any business at the gas station. Although these observations suggested to Agent Teague that the two trucks were part of a common enterprise and that the

occupants of the blue truck might be conducting counter-surveillance, he did not observe any communication between the occupants of the two trucks.

When Officer Lucero arrived at the gas station, he parked in the hotel parking lot and approached the white pickup to talk to its occupants. Marquez and a man later identified as Joel Lujan got out of the truck to speak with him. Officer Lucero asked to see the cocaine, and Marquez responded that he wanted to count the money first. Officer Lucero then said that he would get the money if they would show him the cocaine. Lujan informed Officer Lucero that the cocaine was not there but was close by, and suggested that they go to Officer Lucero's house to complete the sale. Lujan told Officer Lucero that the only cocaine they had with them was a bindle (a folded dollar bill containing a small amount of cocaine), which he and Marquez showed Officer Lucero. A security guard from the hotel then approached the three and asked them to leave the area. Lujan told Officer Lucero that he would follow Officer Lucero out of the parking lot.

Marquez and Lujan got back into the white truck, but rather than driving directly to Officer Lucero's nearby vehicle, they drove into the gas station parking lot and paused directly beside the blue truck while it backed out of its parking space. They then drove back to Officer Lucero's vehicle in the hotel parking lot, with the blue truck following very closely. As the three vehicles

-4-

began to leave the hotel parking lot, an APD officer in a marked police vehicle stopped the white truck. Marquez and Lujan were immediately arrested, and officers began to search the truck. They found no cocaine.

Meanwhile, officers followed the blue truck, which was traveling unusually slowly. They did not stop it immediately because they wanted to use a marked police vehicle and none was readily available. After waiting until Marquez and Lujan had been handcuffed and the officers were sure that no one else was inside the white truck, the APD officer who had stopped the white truck left to stop the blue truck. He stopped the truck about five miles from the gas station. At the time of the stop, the search of the white truck had not been completed. The occupants of the blue truck, Defendant and Hector Torres, were immediately arrested.

Defendant and Torres were taken to the Albuquerque DEA office, where they were booked and placed in holding cells. At the office Defendant consented to a search of the blue truck and made incriminating statements after being advised of his *Miranda* rights. Officers discovered approximately two kilograms of cocaine in a speaker cabinet inside the truck.

Defendant moved to suppress the cocaine and his statements. The district court denied the motion, holding that Defendant's arrest was supported by probable cause and that he voluntarily consented to the search of the blue truck

and its contents.  On appeal Defendant asserts that (1) the stop of the blue truck was not supported by reasonable suspicion, (2) the officers lacked probable cause to arrest him, and (3) his consent to search was tainted by these preceding illegalities.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II.    DISCUSSION

We review de novo whether the historical facts found by the district court support the court's determination that the search and seizure satisfied the Fourth Amendment.  *Toro-Pelaez*, 107 F.3d at 824.  We hold that the officers had probable cause to arrest Defendant when he left the gas station.  Therefore, the stop of the blue truck (which would have been lawful even if there had been only reasonable suspicion) was lawful, Defendant's arrest was lawful, and no evidence need be suppressed.

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation marks omitted).  "Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion."  *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal quotation marks omitted).  "Probable

cause is measured against an objective standard. . . . [T]he primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Valenzuela*, 365 F.3d at 896-97.

Defendant asserts that he was arrested based solely on his presence at the gas station, before the officers "develop[ed] a sufficient factual basis for the warrantless arrest." Aplt. Br. at 30. He notes that the officers "made no attempt to speak with [him] or Mr. Torres before arresting them." *Id.* at 31. In his view, "[t]he agents had no knowledge before arresting [him] that a blue truck was involved with the occupants of the white truck," because neither Defendant nor Torres was mentioned in Officer Lucero's conversations with Marquez and Lujan, and "[t]here is no evidence that any government agents detected any communication between the occupants of the white truck and the occupants of the blue truck." *Id.* at 33. He argues that "[t]he government needed to show with considerably more specificity the knowing nexus between [him] and the conduct of the occupants of the white truck." *Id.* at 36-37 (internal quotation marks omitted). We disagree.

Defendant is correct that "nearness to the place of the arrest of a co-conspirator or to the place of illegal activity is not sufficient to establish probable cause." *United States v. Springfield*, 196 F.3d 1180, 1183 (10th Cir. 1999)

(internal quotation marks omitted). But in this case there is much more than simple proximity. There was no apparent reason for the blue truck to circle the parking lot and later park there except to conduct counter-surveillance. Neither Defendant nor Torres conducted any business at the gas station. Such evidence of counter-surveillance may support a finding of probable cause. *Cf. United States v. Cervine*, 347 F.3d 865, 867-68, 872 (10th Cir. 2003) (evidence of counter-surveillance supported reasonable suspicion). More importantly, the connection between the occupants of the white and blue trucks became obvious when they left the parking lot. The white truck went considerably out of its way to drive from the hotel parking lot to the gas station lot to get the blue truck to follow it before returning to Officer Lucero's vehicle in the hotel lot. The close proximity of the two trucks as they drove through the lot emphasized that they were engaged in a common enterprise. *Cf. United States. v. Lopez-Martinez*, 25 F.3d 1481, 1486 (10th Cir. 1994) (reasonable suspicion supported in part by agent's observation of two cars driving close together at a slow speed on an empty road that could be used to circumvent a border patrol checkpoint). Because the white truck's occupants were known to have come to the gas station solely to deal cocaine, the blue truck's occupants were thus linked to criminal activity. In addition, Lujan had told Officer Lucero that the cocaine was nearby and

suggested that they go to Officer Lucero's house to complete the deal; from these statements, one could infer that the drugs were in a vehicle in the vicinity.

Based on the totality of the circumstances, we conclude that the stop of the blue truck and Defendant's arrest were supported by probable cause. The failure of the officers to question Defendant and Torres before arresting them does not detract from this conclusion. To be sure, when we recently held that an arrest after a vehicle stop was not supported by probable cause, we suggested that the detaining officers' failure to engage in further questioning was careless police work. *Valenzuela*, 365 F.3d at 902. We have not said, however, that such questioning is a necessary predicate for probable cause.

Because Defendant's arrest was lawful, we reject his argument that his consent to search was tainted. The district court properly denied Defendant's motion to suppress.

## III. CONCLUSION

We AFFIRM the judgment below.