FILED
United States Court of Appeals
Tenth Circuit

**March 4, 2008**

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

CARLOS LOPEZ,

      Defendant - Appellee.

No. 07-3159

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 06-CR-20183-JWL)**

Richard A. Friedman, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (Eric F. Melgren, United States Attorney; James A. Brown, Assistant United States Attorney; and David P. Zabel, Special Assistant United States Attorney, District of Kansas, with him on the briefs) for Plaintiff - Appellant.

Michael L. Harris, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with him on the brief), District of Kansas, for Defendant - Appellee.

Before **TACHA, ANDERSON,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

The government seeks to appeal the district court's ruling suppressing

drugs found in the back of Carlos Lopez's truck, but failed to file in a timely

manner the certification required by 18 U.S.C. § 3731 – that is, a document representing that its appeal is not taken for delay and the suppressed evidence is substantial proof of a fact material to the prosecution. Our precedent indicates, however, that this failure is not jurisdictional and should not preclude an appeal so long as the government has materially, if not formally, complied with Section 3731. Because the record demonstrates that the government did, in substance, undertake the evaluation called for by Section 3731 before noticing this appeal, we must proceed to its merits. Doing so, we hold that the events witnessed by government surveillance agents, taken as a whole, provided the officers reasonable suspicion to effect an investigative detention, and we therefore reverse.

I

A

On a December morning in 2006, Dana Suchma, a federal Drug Enforcement Agency special agent, conducted drug-interdiction surveillance at a Best Western hotel in Kansas City, Kansas, near an I-35 interchange. Agent Suchma has ten years' experience in this line of work, and has described his job as including surveillance in hotel/motel parking lots, with an eye toward locating cars that are from "source cities" and then gathering information about the car and driver from hotel employees or others before deciding whether the car's journey

-2-

sounds sufficiently suspicious to merit further monitoring for drug-related activity.

In the Best Western parking lot, Agent Suchma noticed a red pickup truck with its engine running and a person inside smoking a cigarette. Running a check on the truck's Texas license plate, he discovered it was registered to a Carlos Lopez from Pharr, Texas. Agent Suchma consulted a map and found that Pharr is a suburb of McAllen, a border town in south Texas that he believed to be a source city where drugs are brought over the border. The agent then entered the hotel and learned from the clerk that Mr. Lopez checked in the night before at 10:38, checked out that morning at 9:01, and paid cash for his room.

Returning to his own car, Agent Suchma decided to continue monitoring the truck and requested assistance by radio from three other nearby members of his surveillance team. After nearly an hour idling in the hotel parking lot, Mr. Lopez moved his truck from the hotel parking space and drove to one of the parking spaces of a Sonic drive-in restaurant immediately adjacent to the hotel. The agents then saw a green pickup truck, parked near Mr. Lopez's truck in the Best Western parking lot, follow Mr. Lopez's truck into the restaurant parking lot and pull into a space directly next to Mr. Lopez's vehicle on the passenger side.

As soon as both pickup trucks arrived at the Sonic, the agents observed Mr. Lopez get out of his truck and walk to the front of it. At the same time, a passenger in the green truck, Alfonso Urena-Bonilla, exited that vehicle carrying a white styrofoam cooler, and, without speaking with Mr. Lopez, placed it in the

bed of Mr. Lopez's truck. While this transfer was occurring, the driver of the green truck, Ricardo Cardenas-Corona, got out and stood surveying the general area. Agent Suchma, concerned that the driver was engaged in counter-surveillance, relocated his vehicle to remain unnoticed.

Although Mr. Lopez and Mr. Cardenas-Corona stood outside their vehicles in parking spaces directly next to each other, the agents did not observe any communication between them. As soon as Mr. Urena-Bonilla deposited the cooler in Mr. Lopez's truck, Mr. Lopez reentered the vehicle and backed out of the parking space, at which point Mr. Urena-Bonilla came over and spoke with him briefly. After this brief exchange, Mr. Lopez drove out of the Sonic parking lot and proceeded southbound on I-35. None of the men apparently sought breakfast at the Sonic.

After following Mr. Lopez and observing him drive onto I-35, Agent Suchma contacted a member of the Kansas Highway Patrol to request assistance in stopping Mr. Lopez's truck. Highway Patrol Lieutenant Tom Catania and Trooper Charles Lovewell, in a car nearby, responded to the request by calling the agent on his cell phone. Agent Suchma told Lieutenant Catania what he and the other surveillance agents saw at the hotel and restaurant, gave a description of the truck and its plate number, and asked that the Lieutenant and his partner stop Mr. Lopez – for a traffic infraction if possible, although Agent Suchma believed he already had reasonable suspicion to justify an investigative stop.

-4-

Trooper Lovewell located Mr. Lopez's truck and, after following him for a distance, observed the truck weave slightly and the right-side tires momentarily stray over the fog line. Believing this violated state law, Trooper Lovewell pulled Mr. Lopez over. After explaining why he stopped Mr. Lopez and examining his license, registration, and proof of insurance, Trooper Lovewell asked Mr. Lopez about his destination and the significant mileage on his relatively new truck. Mr. Lopez responded that he had driven from Florida to Dallas to Kansas City, and was now returning to Dallas, and that, although he had driven approximately 14,000 miles in the 4 months he had owned the truck, he did not use it for business. The troopers believed this amount of mileage likely excessive for leisure travel and consistent with the operations of a drug courier.

Trooper Lovewell issued Mr. Lopez a written warning for failing to maintain his lane of travel and returned his documents. After he told Mr. Lopez to "have a safe trip" and walked away from the vehicle, and after Mr. Lopez prepared to drive away, Trooper Lovewell turned back toward the truck and knocked on the window. Mr. Lopez motioned for him to open the passenger door, which he did. Trooper Lovewell then asked whether he could ask Mr. Lopez some additional questions. When Mr. Lopez did not object, Trooper Lovewell asked whether he had anything illegal in the vehicle, such as drugs. Lieutenant Catania also came alongside the truck and asked whether Mr. Lopez had any weapons or large amounts of currency. Mr. Lopez responded "no" to these

questions. Trooper Lovewell then asked if he could search the truck and Mr. Lopez answered affirmatively. Trooper Lovewell confirmed that Mr. Lopez understood his request to search and Mr. Lopez against consented. Opening the cooler in the truck bed revealed 3.3 kilograms of methamphetamine.

B

The government filed an indictment charging Mr. Lopez, along with Mr. Urena-Bonilla, with possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Mr. Lopez moved to suppress the contents of the cooler, alleging that his stop and search violated the Fourth Amendment. The district court agreed that the stop wasn't based on reasonable suspicion of a legitimate traffic infraction. A single instance of straying across the fog line without some evidence that it was unsafe to do so is not a traffic infraction under Kansas law, the court held, and Trooper Lowell conceded in his testimony that the circumstances at the time did not make Mr. Lopez's conduct unsafe (*viz*, there were no other cars nearby, the driving conditions weren't hazardous, etc.).

Although the district court recognized that the stop nonetheless could be considered lawful as an investigative detention if Agent Suchma acquired reasonable suspicion Mr. Lopez was involved in criminal drug activity before he asked highway patrol officers to stop Mr. Lopez, the court ruled that the

-6-

observations of the surveillance agents did not provide reasonable suspicion of such conduct, though the court considered this a "close call."

After the district court issued its order suppressing the cooler's contents, the government filed a timely notice of appeal. In its appeal, the government did not contest the district court's ruling that there was insufficient evidence of a traffic infraction for crossing a lane marker to support a traffic stop, but argued that the circumstances surrounding the transfer of the cooler did give rise to reasonable suspicion of criminal activity sufficient to justify a brief investigative detention. At the same time, however, the government failed to certify to the district court, as required by 18 U.S.C. § 3731,[1] that its interlocutory appeal was not taken for purpose of delay and the suppressed evidence was a substantial

---

[1] The pertinent portions of 18 U.S.C. § 3731 state:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

. . .

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The provisions of this section shall be liberally construed to effectuate its purposes.

proof of a fact material in the proceeding. In light of this deficiency, we entered an order to show cause why the case should not be dismissed. In response, the government filed the required certification and represented that its failure to file the document earlier was an oversight. During the briefing of this appeal, the government filed an unopposed motion (which we now grant) to supplement its response to our order to show cause, appending three sworn affidavits from the government attorneys involved in this case.

In its filings, the government explained that a Section 3731 certification was not filed because the Assistant United States Attorney ("AUSA") who prepared the notice of appeal was relatively new to federal practice, this was his first appeal of a suppression order, and he was unaware of the certification requirement. The government also detailed the analysis the involved attorneys undertook before deciding to appeal. In their affidavits, the three attorneys represented that, over an extended number of days, they each considered the merits of an appeal, discussed with each other and other attorneys whether the case should be appealed, and prepared an internal memorandum analyzing the merits and demerits of a potential appeal. They each also represented that, at the time they filed the notice of appeal (or requested that the notice be filed), it was clear to them that a Section 3731 certification could have been filed in good faith. Finally, the government represented that it has "assured that all [AUSAs] in the District [of Kansas] have been directed to familiarize themselves with" the

necessity of complying with Section 3731's certification requirement, Appellant's Br. at 17, and that the prosecution of Mr. Lopez will be "substantially impaired, and probably defeated" if the drug evidence remains suppressed, *id.* at 20.

## II

Failure to file a Section 3731 certificate within 30 days after an adverse district court decision does not deprive this court of jurisdiction but instead poses us with a discretionary question. *United States v. Welsch*, 446 F.2d 220, 224 (10th Cir. 1971). As Federal Rule of Appellate Procedure 3(a)(2) explains, "[a]n appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal."

In deciding whether to exercise our discretion to hear an appeal, we are guided by Congress's express purpose in enacting the certification requirement – namely, to ensure that government attorneys make "'a thorough and conscientious analysis of the case *before* deciding to appeal.'" *United States v. Carrillo-Bernal*, 58 F.3d 1490, 1493 (10th Cir. 1995) (studying congressional purpose and quoting *United States v. Hanks*, 24 F.3d 1235, 1239 (10th Cir. 1994)). In this light, we have acknowledged that the statute itself "admonishes us to construe the statute liberally to effectuate its purposes" and so precludes us from enforcing "a per se rule that all government appeals in which there has been an untimely filing of the certification must be dismissed. To the contrary, we will look 'liberally' at any

explanation offered by the government for its failure to comply with this requirement." *Hanks*, 24 F.3d at 1239. The bottom line, then, in Section 3731 cases is this: we look to see whether the government complied in substance, if not form, with the statutory requirement that it perform a reasoned analysis *before* filing its notice of appeal.

For example, in *Carrillo-Bernal*, we dismissed the government's belatedly-certified appeal because the government admitted that it appealed "in haste" almost immediately after learning of the district court's ruling and made no demonstration that its decision to appeal was preceded by "a reasoned determination as to the considerations that Congress has expressly incorporated into Section 3731." *Carrillo-Bernal*, 58 F.3d at 1492, 1494. The certification was eventually sworn and filed by an attorney who was uninvolved in the matter until that point and thus was unable to represent the motivation and basis for the appeal by the actual decisionmakers in the first instance. *Id.* at 1494. Because the court had before it no demonstration of a reasoned pre-appeal analysis by the responsible prosecuting official, it could not be satisfied that such analysis had taken place and the purpose of the certification requirement had been honored.

To be sure, the government in *Carrillo-Bernal* argued that, even if it had failed to conduct a pre-appeal analysis of the case, the matter was of sufficient importance that equity demanded its consideration, and we have recognized such an exception to the prior-consideration rule. *Id.* at 1496-97; *see Hanks*, 24 F.3d at

1239 ("[W]hen the underlying appeal raises important legal issues needing appellate clarification, in the interest of justice, or for any significant other reason to hear the interlocutory appeal, we may excuse the late filing of a § 3731 certificate."). But the majority in *Carrillo-Bernal* indicated, albeit over a dissent, that the case presented no important legal issue in need of appellate clarification. *Carrillo-Bernal*, 58 F.3d at 1497.

In *Hanks* the government did not address the certification issue at all in briefing, despite a jurisdictional motion and briefing by the defendant; instead, this court had to inquire about it at oral argument and order supplemental briefing post-argument. *Hanks*, 24 F.3d at 1238. When the government finally did issue its certification, it failed to make it part of the record on appeal and expended no effort to explain why the appeal should be heard, or "even to acknowledge that the certification requirement in § 3731 should be taken seriously." *Id.*

In contrast with these cases is *United States v. Shareef*, 100 F.3d 1491 (10th Cir. 1996), where, after filing its tardy certification, the government provided the court with an affidavit representing that the AUSA involved in the case had undertaken the analysis required by the statute before filing a notice of appeal. *Id.* at 1499 n.2. In light of this uncontested affidavit, we exercised our discretion to hear the government's appeal despite the lack of a timely and complete Section 3731 certification because we were "satisfied that the

government's decision to appeal 'was preceded by a reasoned determination as to the [§ 3731 factors].'" *Id.* (quoting *Carrillo-Bernal*, 58 F.3d at 1494).

We believe this case falls on the *Shareef*, rather than *Hanks/Carrillo-Bernal*, side of the line. Apparently, the only reason the government failed to file a timely certification was due to the relative inexperience of the AUSA who filed the notice of appeal – and the government stresses it has addressed the matter with the AUSA in question and taken steps calculated to minimize the recurrence of this problem in the future. The uncontested affidavits before us reveal that the government did, in fact, undertake a reasoned pre-appeal analysis of the Section 3731 factors, involving a number of attorneys thinking about this case over an extended number of days who prepared a written memorandum analyzing the proposed appeal. The affidavits before us each also represents that, at the time the government filed the notice of appeal, it was clear to the involved attorneys that a Section 3731 certification could have been filed in good faith – that is to say, that the appeal was not for purposes of delay and the evidence was a substantial proof of a fact material in the proceeding. Given the uniformity of the evidence that the government complied with the substance if not form of Section 3731, we are obliged to entertain this appeal and have no need to reach the government's alternative argument that this case presents the sort of important legal question in need of appellate resolution that *Carrillo-Bernal* indicated could merit an exception to the prior-consideration rule.

Mr. Lopez responds that, even if the government did comply in substance with Section 3731's requirements, his right to a speedy trial and need for protection from the hazards of prolonged litigation should nonetheless dictate dismissal of this appeal. While the delayed resolution of a case surely can weigh heavily on a criminal defendant's mind, *see Hanks*, 24 F.3d at 1238, Mr. Lopez identifies no basis to believe that the government's failure to issue a timely Section 3731 certificate caused any delay in the prosecution of his case beyond that inherently associated with the resolution of an interlocutory appeal. Neither are we pointed to any authority or given any reason why we should dismiss an appeal under these circumstances. To the contrary, if the delay inherent in an interlocutory appeal where a certification isn't timely filed sufficed to warrant dismissal, that would effectively establish a *per se* rule requiring dismissal of all cases where the government fails to supply a timely Section 3731 certification and thus undo our binding precedent requiring us to entertain appeals where the government substantively, if not formally, complies with the statute. Accordingly, even if some egregious delay caused by the government's failure to comply with Section 3731 could supply a basis for dismissing an appeal (an issue we need not address today), we hold that the delay inherent in an interlocutory suppression appeal and judicial resolution of a Section 3731 issue does not form a sufficient basis on which to dismiss an appeal.

III

Turning to the merits, we begin by noting that the facts surrounding the surveillance of Mr. Lopez are not meaningfully in dispute. Accordingly, the only question before us is their legal significance, a question we review *de novo*. In assessing the constitutionality of an investigatory stop, we ask whether the circumstances demonstrate that law enforcement officers had reasonable suspicion that criminal activity may have been afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205-06 (10th Cir. 2007). In making this determination, we look at the totality of the circumstances to determine whether a particularized and objective basis, viewed from the standpoint of an objectively reasonable police officer, existed for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273. Courts may not evaluate and reject each contributing factor in isolation, for reasonable suspicion can exist even if each individual observation is susceptible of innocent explanation. *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007). Rather, even factors that are entirely innocent when taken separately can support a lawful detention if, taken together, they reasonably suggest the presence of illegal conduct. *United States v. Ramirez*, 479 F.3d 1229, 1244 (10th Cir. 2007); *see Guerrero*, 472 F.3d at 787. In analyzing whether a given set of factors gives rise to the requisite reasonable suspicion, we are reminded that we must "be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to

grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *Ramirez*, 479 F.3d at 1244 (internal quotation omitted).

With these rules of review in mind, we consider the factors that contributed to the officers' suspicion in this case. The officers saw a rendezvous in which Mr. Lopez's truck, after idling for an hour, moved in concert with the green truck from the hotel to the drive-in restaurant. They saw the passenger of the green truck, Mr. Urena-Bonilla, deposit the cooler into the bed of Mr. Lopez's truck. They then saw Mr. Lopez promptly leave the restaurant for the interstate. Agent Suchma and Lieutenant Catania each testified that, based on his training and experience in hotel drug-interdiction surveillance, an exchange of this sort was indicative of illegal activity. Agent Suchma testified that "it is not uncommon to find coolers, . . . things of that nature, exchanged in a public area; and it is not uncommon to later find that those . . . containers or coolers contain either drugs or a sum of bulk currency." Hr'g Tr. at 21. Lieutenant Catania testified that "one of the things that we would watch for . . . was an exchange of some sort, somebody bringing a vehicle to somebody . . . or an exchange in the parking lot or meeting with somebody else at an alternate location and then an exchange being made. Those are the things we typically saw, and the fact that one was made in this case made it very suspicious." *Id.* at 100.

The officers observed this hand-off in the context of other suspicious circumstances as well. First, they saw what appeared to be counter-surveillance by the driver of the green truck, Mr. Cardenas-Corona. Second, there was a dearth of communication between the parties to the exchange. Although all three parties to the transaction were standing outside their adjacent vehicles in the parking lot, the officers observed no customary greeting or words exchanged between them, no acknowledgment of each others' existence. Only when Mr. Lopez backed his truck out of the parking space to leave the restaurant did he and the passenger of the green truck briefly appear to speak to each other. Third, the parties moved their trucks from the hotel parking lot to the adjacent drive-in restaurant parking lot, where the hand-off took place, even though neither appeared to order or receive any food at the drive-in or enter the restaurant.

The district court did not include any of these three circumstances in its reasonable suspicion analysis, perhaps because they represent omissions, or things that didn't happen. But the government reminds us of the logical significance of the dog that didn't bark,[2] and we believe that omission of an expected or

_____

[2] In Sir Arthur Conan Doyle's story, Inspector Gregory posited that a stranger had stolen a race horse from Colonel Ross's barn in the night. But Sherlock Holmes asked how he could explain the "curious incident" of the guard dog's silence. Holmes later revealed that the dog was silent because the thief was the horse's trainer, a person familiar to the dog. *See* Sir Arthur Conan Doyle, *Silver Blaze, in* The Memoirs of Sherlock Holmes (1894).

customary action, equal to actions themselves, can be of use in assessing whether something is amiss and criminal activity may be afoot.

Mr. Lopez responds that Agent Suchma's testimony does not indicate that he or his team inferred that Mr. Cardenas-Corona was engaged in counter-surveillance, so we should not consider that factor as contributing to reasonable suspicion. But Agent Suchma testified that an agent on his surveillance team saw the driver of the green truck exit his truck at the drive-in restaurant and stand around, looking about while the passenger put the cooler in the bed of Mr. Lopez's truck. Hr'g Tr. at 18, 38-39. He then testified that, based on this observation, he thought, "in the event this guy is trying to conduct some type of countersurveillance, I was not comfortable with where I was," so he moved his vehicle, because he "didn't want to compromise the surveillance." *Id.* at 39. Agent Suchma's testimony is easily understood as saying that he took action to preserve his cover based on his inference that the driver was engaged in counter-surveillance. Mr. Lopez does not contest that a reasonable officer could make this inference, and Agent Suchma's testimony indicated that he did so, which contributed to his reasonable suspicion.

To be sure, as the district court correctly noted, some of the other factors identified as contributing to the officers' suspicion are relatively weak. For example, the government's reliance on the fact that Mr. Lopez traveled from a known drug source area is a factor that we have previously held so consistent with

innocent activity as to "do[] little" when standing alone to add to the reasonable suspicion calculus. *Guerrero*, 472 F.3d at 788. Likewise, the fact that Mr. Lopez paid a modest sum of cash for a single night's stay in a hotel can be "afforded little weight," given how common the conduct is and how consistent it is with ordinary and lawful travel. *United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992), *overruled on other grounds, United States v. Little*, 18 F.3d 1499 (10th Cir. 1994) (en banc).

But neither of these factors stands alone in this case or is even necessarily essential to our conclusion. Rather, the exchange of the cooler and the circumstances surrounding the exchange, considered as a whole and with the due deference commanded by our precedent to the officers' experience and training, suggest that reasonable suspicion of criminal activity existed sufficient to justify a brief investigative detention. In reaching this conclusion we are mindful that the level of suspicion required for reasonable suspicion is "considerably less" than proof by a preponderance of the evidence or that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Officers merely need an articulable reasonable suspicion that criminal activity may be afoot – they need not even assert a "fair probability" that their investigation will actually turn up evidence of criminal activity. *Id.*

In fact, this court has found even probable cause to arrest, above and beyond reasonable suspicion, based on a defendant's suspected counter-

-18-

surveillance incident to a drug deal. In *United States v. Soto*, 375 F.3d 1219 (10th Cir. 2004), an undercover officer had arranged to purchase drugs from men in a white truck at a gas station. Surveillance officers observed a blue truck enter the gas station parking lot, circle the lot, and then leave, shortly before the white truck arrived and parked in an adjacent hotel parking lot. *Id.* at 1221. The blue truck later returned and parked in the gas station lot, with an unobstructed view of the white truck, although its occupants did not leave the vehicle to conduct any business at the gas station. *Id.* The undercover officer discussed the drug deal with the men in the white truck, who suggested they go to a different location to complete the sale. *Id.* Officers later stopped the blue truck and arrested its occupants five miles down the road from where they stopped the white truck but before they searched the white truck for contraband. *Id.* Although one could well think of innocent explanations for the movements of the blue truck, we held that the apparent counter-surveillance and connection with the white truck, based on the officers' experience with situations of this sort, were enough to establish probable cause for arrest. *See id.* at 1220, 1223. Even though the officers in *Soto* knew that the men in the white truck were involved in criminal activity, the suspected connection between the men in the blue truck and this criminal activity was based entirely on circumstantial factors capable of innocent explanation. Likewise, in the present case, activities, circumstances, and omissions of a similar nature to those in *Soto* are enough, based on the officers' experience with drug

-19-

trafficking exchange scenarios, to indicate a connection to criminal activity and pass the lower threshold of reasonable suspicion.

* * *

The district court's suppression order is

*Reversed.*