FILED
United States Court of Appeals
Tenth Circuit

May 2, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JORGE LUIS OLIVARES-CAMPOS,

Defendant-Appellant.

No. 06-3411
(D.C. No. 06-CR-40074-001-JAR)
(D. Kansas)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HOLLOWAY**, and **GORSUCH**, Circuit Judges.

Jorge Olivares-Campos challenges the district court's denial of his motion to suppress drugs found in a search of his truck. Mr. Olivares-Campos argues that what began as a consensual encounter at a gas station became an illegal detention when the sheriff's deputy retained his license and registration without reasonable suspicion, and this illegal detention tainted his subsequent consent to the deputy's request to search his truck, thus requiring suppression of the drugs found in that search as "fruit of a poisonous tree." Even assuming the deputy seized Mr.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Olivares-Campos within the meaning of the Fourth Amendment when he retained his license and registration, we hold that reasonable suspicion of criminal activity existed at that time sufficient to justify a lawful investigative detention. Mr. Olivares-Campos's subsequent consent to the search of his truck therefore was not tainted by an illegal seizure, and neither does it bear any other indicia of unlawful coercion. Accordingly, we affirm.

I

Mr. Olivares-Campos stopped for gas at Kelly's Express in Topeka, Kansas, near Interstate 70, on an April morning in 2005. While Mr. Olivares-Campos filled up his pickup truck, Shawnee County Sheriff's Deputy Brian Rhodd arrived and parked his patrol car in front of the convenience store attached to the gas station. Deputy Rhodd observed that Mr. Olivares-Campos's truck had a California license plate, and he noticed Mr. Olivares-Campos stealing glances at him.

Deputy Rhodd approached Mr. Olivares-Campos and asked if he could speak with him, and Mr. Olivares-Campos agreed. Deputy Rhodd inquired about Mr. Olivares-Campos's travel plans; Mr. Olivares-Campos replied that he was traveling from California to Kansas City, where he planned to find work on a golf course. Mr. Olivares-Campos explained that he did not know where he was going to live in Kansas City and that he had to call someone when he arrived. Deputy

Rhodd noticed that the bed of the truck contained only extension cords and Mr. Olivares-Campos was traveling with only one small bag.

During the pair's conversation, it came out that Mr. Olivares-Campos did not own the truck he was driving and that he only knew the owner by his first name, Francisco. He offered the vehicle registration to Deputy Rhodd, which showed the truck was owned by a Francisco Rosales. Deputy Rhodd then asked Mr. Olivares-Campos for his license. Deputy Rhodd later testified that as Mr. Olivares-Campos held out his documents his hand shook severely – so much so that he could not still it – and his heart pounded visibly through his shirt.

While Mr. Olivares-Campos went to pay for the gas inside the convenience store, Deputy Rhodd took the vehicle registration and driver's license to his patrol car to run checks through dispatch. At this time he also moved his patrol car next to Mr. Olivares-Campos's truck, though without blocking it, and called Deputy Tracey Trammel, a canine handler, to the scene for assistance. When Mr. Olivares-Campos returned from paying for the gas, Deputy Rhodd returned his documents and asked where and with whom he was staying in Kansas City. Mr. Olivares-Campos said he was going to stay with his friend Francisco, the owner of the vehicle. Deputy Rhodd then asked how Mr. Olivares-Campos had come into possession of the truck, and Mr. Olivares-Campos explained that he had flown from Washington state to California to pick up the truck and was driving it to Kansas City as a favor for Francisco. During this conversation, dispatch

- 3 -

reported that Mr. Olivares-Campos's license was expired, but that he had no criminal history, and that the truck was registered in California to Francisco Rosales. Deputy Rhodd advised Mr. Olivares-Campos to take care of his expired license but later testified that he would not have arrested him for this offense.

After this, Deputy Rhodd wrapped up the conversation, saying "hey, I appreciate it, okay," and Mr. Olivares-Campos replied "thanks, man." But then Deputy Rhodd inquired if he could ask Mr. Olivares-Campos a few more questions. Though Mr. Olivares-Campos responded that he had to go, Deputy Rhodd nonetheless began asking whether there was anything illegal in the vehicle. Deputy Rhodd asked specifically whether Mr. Olivares-Campos was transporting marijuana, cocaine, heroin, methamphetamine, or illegal drugs. Mr. Olivares-Campos denied all of this, but Deputy Rhodd later testified that when Mr. Olivares-Campos denied transporting methamphetamine, he looked away in a manner Deputy Rhodd interpreted as deceitful.

Deputy Rhodd then asked for permission to search the truck, and Mr. Olivares-Campos agreed. Deputy Rhodd asked whether Mr. Olivares-Campos was more comfortable reading in Spanish or English, and when Mr. Olivares-Campos responded that he was more comfortable with Spanish, Deputy Rhodd provided him with a consent to search form that was written in Spanish, which Mr. Olivares-Campos read and signed. The form clarified that Mr. Olivares-Campos did not have to consent to the search or sign the form and that, by signing

the form, he acknowledged that no promises, threats, force, or coercion had been used against him to secure his consent or signature.

While Mr. Olivares-Campos was reading the consent form, Deputy Trammel arrived with his drug detection dog, which he ran around the truck. The dog did not alert. After Mr. Olivares-Campos signed the consent form, Deputy Rhodd directed him to move his truck to the south end of the parking lot, where he and Deputy Trammel began to search it. They noticed a heavy undercoating spray under the bed of the truck, which they testified is sometimes used to disguise welds and other indications of a hidden compartment fashioned for carrying contraband. Deputy Trammel also noticed freshly tooled bolts, suggesting to him that the bed of the truck had been removed recently, though the bed itself was not new. Eventually, Deputy Trammel drilled a hole up into the truck and, using a probe, discovered a cavity containing something movable and saw cellophane. The deputies asked Mr. Olivares-Campos to follow them in his truck to the sheriff's office approximately seven miles away; there they ultimately found fourteen packages amounting to 5,820 grams of methamphetamine inside the hidden compartment.

Charged with possessing with intent to distribute approximately seven kilograms of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), Mr. Olivares-Campos moved to suppress the drugs as fruits of an illegal detention and

search.[1]  The district court denied the motion, finding that the entire encounter was consensual.  Alternatively, even if Mr. Olivares-Campos was detained, the court held that reasonable suspicion existed that he was involved in trafficking drugs and he thereafter freely consented to the search of his vehicle.  After the court's ruling, Mr. Olivares-Campos entered a conditional guilty plea, reserving the right to appeal the district court's suppression order.

II

As in all appeals from a district court's order on a motion to suppress, we approach Mr. Olivares-Campos's appeal viewing the record evidence in the light most favorable to the district court's ruling and accepting its factual findings unless clearly erroneous; we assess *de novo*, however, the legal questions of whether a seizure occurred and whether it was reasonable under the Fourth Amendment.  *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205 (10th Cir. 2007).  With these standards of review in mind, we first address the question whether the entire encounter at the gas station was consensual or, alternatively, whether Deputy Rhodd had reasonable suspicion sufficient to support an investigative detention; thereafter, we examine Mr. Olivares-Campos's challenge to the search of his vehicle.

---

[1]  Before the district court, Mr. Olivares-Campos also disputed whether the deputies exceeded the scope of his consent when they drilled into his truck.  The district court ruled against him on this score, and Mr. Olivares-Campos has not contested that ruling on appeal.

A

In accord with the district court's primary holding, the government begins by suggesting that Mr. Olivares-Campos's entire encounter with Deputy Rhodd was consensual. Mr. Olivares-Campos responds that what started as a consensual encounter became an investigatory detention, for which reasonable suspicion was required, when Deputy Rhodd took Mr. Olivares-Campos's license and registration to run checks on them. This poses us with a somewhat novel question of law.

On the one hand, it is well settled that police may ask to see identification without effecting a seizure. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); *United States v. Johnson*, 364 F.3d 1185, 1188-89 (10th Cir. 2004). On the other hand, our precedent also "clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter," the defining characteristic of a Fourth Amendment seizure. *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995); *see also United States v. Guerrero*, 472 F.3d 784, 786-87 (10th Cir. 2007); *United States v. Lopez*, 443 F.3d 1280, 1285 (10th Cir. 2006); *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308-09 (10th Cir. 2006). And to be lawful, such a seizure requires, in the case of an investigatory detention, reasonable suspicion that illegal activity is afoot. *See United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008).

This case seems to fall somewhere between these two poles. The deputy did more than examine Mr. Olivares-Campos's license and registration; he took the documents for several minutes, went to his squad car, and ran a background check. We have consistently recognized that a reasonable person does not feel free to leave when the police officer is retaining his or her license and registration to perform such a check. *See Lopez*, 443 F.3d at 1285-86; *Lambert*, 46 F.3d at 1068-69. After all, one can hardly drive off without such documents – at least without surely violating the law. *See, e.g.*, Kan. Stat. Ann. § 8-244.[2] At the same time, as the district court observed, in this particular case Mr. Olivares-Campos had to go inside the convenience store to pay for his gas while the deputy retained the documents, and he received the documents back as soon as he returned. The interaction took place in public, the deputy never told Mr. Olivares-Campos he was not free to leave, and the deputy did not use his car to block Mr. Olivares-Campos's truck from the gas station exit. Under this particular fact pattern, the government argues, a reasonable person would not have felt constrained from departing when he or she wished.

---

[2] "While we agree with the government that Mr. Lambert could have left the airport by plane, taxi, or simply walking down the street, as a practical matter he was not free to go. . . . He could not lawfully leave the parking lot in his car without his driver's license. The question of whether an individual has been detained turns on whether a person under the circumstances would reasonably feel at liberty to refuse the agents' questions or otherwise terminate the encounter. The question is not . . . whether it is conceivable that a person could leave the location of that encounter." *Lambert*, 46 F.3d at 1068.

Happily, we need not resolve this question. Even assuming that Deputy Rhodd did effect a seizure when he took Mr. Olivares-Campos's license, our precedent reveals that, by that time, he had reasonable suspicion that criminal activity was afoot and thus a lawful basis to effect an investigative detention. *See Lopez*, 518 F.3d at 797. We accordingly affirm the district court on the basis of its alternative holding.

B

In assessing whether reasonable suspicion existed to support an investigative detention, a question of law, we look at the totality of the circumstances, viewed from the standpoint of an objectively reasonable police officer and granting deference to the officer's training and experience, to determine whether a particularized and objective basis existed for suspecting illegal activity. *Id.* The reasonable suspicion standard "requires an officer to have 'some minimal level of objective justification,' but he or she 'need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for [an investigative] stop.'" *Cortez-Galaviz*, 495 F.3d at 1206 (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984) and *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)). Thus, the reasonable suspicion requirement is "obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In this

case, several factors recognized by our case law lead us to conclude that standard was met.

First, Mr. Olivares-Campos was driving a truck registered to someone else, the owner was not present, and Mr. Olivares-Campos could only identify the owner by his first name. While not unavoidably associated with unlawful activity, we have often held the fact that a vehicle's owner is an absent third-party to be a suspicious circumstance indicating a stolen vehicle or drug trafficking, especially when the driver cannot provide details about the owner or proof of authority to operate the vehicle. *See, e.g.*, *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) ("[T]he inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning."); *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (vehicle registered to someone other than driver or passenger).

Second, Mr. Olivares-Campos was traveling with only one small bag – an amount of luggage seemingly inconsistent with the stated purpose of his trip and something our case law holds sufficiently suspicious that it may contribute to reasonable suspicion of involvement in illegal activity. *See, e.g.*, *United States v. Arango*, 912 F.2d 441, 443, 447 (10th Cir. 1990) (two small bags for a two-person two week vacation); *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986) ("very little luggage" despite claim of being on vacation). Mr. Olivares-Campos replies that it is possible he wanted to secure work in Kansas City before

moving all of his possessions, and this is certainly a plausible explanation for traveling light. But, as we have already indicated, an officer need not rule out all innocent explanations of the conduct he or she observes, *see Cortez-Galaviz*, 495 F.3d at 1206, and factors that are entirely innocent when taken separately can, when taken together, reasonably suggest illegal conduct, *Lopez*, 518 F.3d at 797.

Third, Mr. Olivares-Campos's uncertainty about where he was going in Kansas City contributes to the mix. He initially told Deputy Rhodd that he did not know where he was going to stay in Kansas City and that he had to call someone when he arrived. Deputy Rhodd testified that

> [t]his is a very common – in my experience, this has been a very common statement made by people who are making up their story as they're going. They don't really know where they're going because they don't know the people that they're going to see. Somebody that the person that they got the drugs from has set up with them, gave them a phone number, and they don't really know what they're supposed to do when they get there, just call. And that's how they do the drug transaction. That's why they don't know any details.

R. Vol. II at 15. We have found similar situations, in which the driver's particular destination was unknown or could not be pinpointed, to contribute to the reasonable suspicion of an experienced officer. *See, e.g.*, *United States v. Mendez*, 118 F.3d 1426, 1431-32 (10th Cir. 1997); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995).

Finally, Deputy Rhodd testified that he observed Mr. Olivares-Campos shaking severely and his heart visibly pounding. Although nervousness is of

limited significance and must be treated with caution under our case law, *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994), it does contribute something more than nothing "to the overall calculus of suspicious behavior, especially when, as here, it is extreme." *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007); *see also United States v. Williams*, 271 F.3d 1262, 1268-69 (10th Cir. 2001) (extreme or continued nervousness).

That the combination of these factors paints a picture sufficient to raise an officer's reasonable suspicion that criminal activity is afoot is demonstrated by a comparison to cases where we have found reasonable suspicion present in similarly, and even arguably less, telling circumstances. For example, in *United States v. Soto*, 988 F.2d 1548 (10th Cir. 1993), the defendant claimed that his uncle was the registered owner of the vehicle he was driving, but he could not, or would not, provide his uncle's address. He also appeared nervous or "panicky," as his hands were visibly shaking. *Id.* at 1550. The court concluded that these two circumstances – the defendant's nervousness and the relatively little information he knew about the registered owner of the vehicle – provided reasonable suspicion for the officer to detain the defendant for additional questioning about narcotics and weapons. *Id.* at 1556.

Similarly, in *United States v. Arango*, 912 F.2d 441 (10th Cir. 1990), we found reasonable suspicion that the vehicle was being used to carry contraband based on the defendant's inadequate amount of luggage and his inability to prove

lawful possession of the vehicle. *Id.* at 447. In that case, the defendant told the officer that the registered owners were friends who had loaned him the truck, but when the officer asked for the owners' phone number, the defendant insisted they did not have a phone – a fact confirmed by the police dispatcher – so the officer was unable to contact the owners. *Id.* at 443. In addition, the defendant claimed to be on a two week vacation, but the two small bags in the bed of the truck appeared inadequate luggage for both the defendant and his passenger on a trip of that length. *Id.* Based on these two factors, the court concluded that the officer had reasonable suspicion to detain the defendant for further questioning. *Id.* at 447; *see also Turner*, 928 F.2d at 959 (reasonable suspicion based on nervousness, the fact that the car was not registered to the driver or passenger, and the driver's claim to be a mechanic despite a personal appearance and compact disc collection supposedly inconsistent with that occupation); *Espinosa*, 782 F.2d at 891 (reasonable suspicion based on hesitation prior to answering questions, temporary license plate, travel from drug source area, and relative lack of luggage for vacation).[3]

---

[3] Mr. Olivares-Campos urges us to compare his case to *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), where he claims law enforcement had greater reason for suspicion than here but we held the totality of the circumstances insufficient to support an investigative detention. In fact, however, "[a]fter stripping away the factors which must be disregarded because they are innocuous, [the *Wood* court was] left with Mr. Wood's nervousness and his prior narcotic history." *Id.* at 948. The current case presents both more and stronger factors than the two present in *Wood*, especially the absent third-party vehicle

(continued...)

- 13 -

Having emphasized what influences our decision, we think it equally important to emphasize what does not. We do not reference Mr. Olivares-Campos's expired driver's license in our reasonable suspicion calculus because Deputy Rhodd only discovered this fact after he retained the license and, on our hypothesis, effected a detention. The government invites us to rely upon three other facts – (1) Mr. Olivares-Campos was traveling from a drug source state to a drug destination city, (2) there were food wrappers in the vehicle, and (3) there was a religious picture on the dash – but we decline the invitation. Travel between "known drug source states" (California) and "destination areas" (Kansas City) is "so consistent with innocent activity as to do little when standing alone to add to the reasonable suspicion calculus." *Lopez*, 518 F.3d at 799. Although the factor does not, of course, stand alone in this case, it is nevertheless "relatively weak," *id.*, and not essential to our conclusion that reasonable suspicion existed here. We have also previously foreclosed the possibility that finding food wrappers in vehicles is of much use in assessing reasonable suspicion of drug activity because remnants from fast-food restaurants have, to put it mildly, "become ubiquitous in modern interstate travel"; as anyone who travels cross-country on I-70 well knows, fast food exists in overabundance and fuels many

[3](...continued)
owner, about whom Mr. Olivares-Campos knew little, an amount of luggage inconsistent with the purpose of his trip, and his unknown destination in Kansas City, in addition to the shared (and less probative) factor of nervousness.

long haul drives. *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("[A]ny suspicion associated with [food wrappers] is virtually nonexistent."). We are also at a loss to see how the presence of religious iconography, like a St. Christopher medallion or a depiction of Jesus (found in so many cars and trucks that it has inspired a popular American folk song[4]), could, without some convincing additional factual predicate (such as the affiliation of certain gangs with particular religious symbols), contribute anything of value suggesting illegal activity as opposed to honest devotion. *See Guerrero*, 472 F.3d at 788 (religious iconography provides "no reasonable indicium of wrongdoing").

C

Having determined that his detention was lawful, the remaining question before us concerns the search of Mr. Olivares-Campos's vehicle. Mr. Olivares-Campos concedes that he consented to the search of his truck, but argues that, because his initial detention was unlawful, his subsequent consent is, as it were, fruit of a poisonous tree. *See United States v. Gregory*, 79 F.3d 973, 979-80 (10th Cir. 1996) (holding that consent to search was tainted by preceding illegal detention and therefore invalid); *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir. 1989) ("If the consent is not sufficiently an act of free will to purge the

---

[4] Ed Rush & George Cromarty, *Plastic Jesus*, *on* Here They Are! The Goldcoast Singers (World Pacific Records 1962). (Other renditions are many and diverse, and include those by Ernie Marrs, Paul Newman in *Cool Hand Luke*, and Billy Idol.)

primary taint of the illegal arrest, it must be suppressed as fruit of the poisonous tree."). But the major premise of this argument – the unlawfulness of Mr. Olivares-Campos's detention – is flawed, as we have seen. His conclusion therefore does not follow: Mr. Olivares-Campos was lawfully detained, so his consent to the search cannot be said to be "poisonously" tainted by that detention.[5]

Reading Mr. Olivares-Campos's brief charitably, he might be understood to make the additional and somewhat different argument that, even if his detention was lawful, his consent to search was nevertheless invalid because it was the product of unlawful coercion – that is, his consent was not voluntary. Thus understood, Mr. Olivares-Campos's argument requires an inquiry into "whether a reasonable person would believe he or she was free to leave or disregard the officer's request under the totality of the circumstances." *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118 (10th Cir. 2007) (quotation omitted). The district court made just such an inquiry and found, as a matter of fact, that

---

[5] It is not altogether clear to us whether on appeal Mr. Olivares-Campos seeks the suppression of certain inculpatory statements (made to law enforcement after the search and receiving *Miranda* warnings) on the basis that they, too, are fruits of an illegal seizure. *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1190 (10th Cir. 2007) ("[A] party waives those arguments that its opening brief inadequately addresses."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (collecting cases). But any such argument would fail for the same reason – *viz.*, Mr. Olivares-Campos's detention was lawful and thus could not taint anything that followed.

Mr. Olivares-Campos's consent was voluntary. We cannot conclude this factual finding was clearly erroneous.

Although the fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual, our precedent firmly instructs us that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary. *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) ("A person who is being detained may still give a voluntary consent."); *Soto*, 988 F.2d at 1557 ("Valid consent may be given by a person being detained."). Instead, detention is only one factor to consider in assessing whether the totality of the circumstances would have communicated to a reasonable person that he or she was not free to decline a request to search. *See Contreras*, 506 F.3d at 1037. Here, there are no other meaningful factors to consider. None of the classic telltales of consent unlawfully extracted exist in this record – no threats, brandishing of weapons, aggressive language, or the like.[6] The deputy requested permission to search during the day, in a public place, after he had already returned Mr. Olivares-

---

[6] "Courts have identified several factors that could lead a reasonable innocent person to believe he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects . . . ; a request to accompany the officer to the station; interaction in a nonpublic place or small, enclosed space; and absence of other members of the public." *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).

Campos's license and registration, and during a calm and professional conversation. After Mr. Olivares-Campos gave his consent to the search orally, the deputy offered him a written consent form, and when Mr. Olivares-Campos indicated he was more comfortable with Spanish, the deputy supplied a form in that language. Not only did the deputy secure both oral and written consent, but the written consent form expressly stated that "no promises, threats, physical or mental coercion of any kind whatsoever" had been used to secure Mr. Olivares-Campos's consent. D. Ct. Order at 10. We have routinely found consent given under similar, and even arguably less convincing, circumstances to be free of unlawful coercion. *See, e.g.*, *Contreras*, 506 F.3d at 1037; *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162-63 (10th Cir. 2001).[7]

* * *

Mr. Olivares-Campos voluntarily consented to the search of his truck in the course of a legal investigative detention. The evidence discovered as a result of

[7] The only factor even arguably tending in a different direction is the fact that Deputy Trammel apparently arrived on the scene with his drug detection dog at some point before Mr. Olivares-Campos signed the consent form. But Mr. Olivares-Campos does not allege that Deputy Trammel or the dog approached him at that time, and the video of the stop shows Deputy Trammel leading the dog around the truck (on camera) as Mr. Olivares-Campos signed the consent form (off camera), after he had already given verbal consent. Standing alone, this factor does not make the district court's finding of voluntariness clearly erroneous. *See United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (holding consent voluntary despite presence of a second police officer on the scene); *United States v. Taverna*, 348 F.3d 873, 879 (10th Cir. 2003) (holding consent voluntary despite presence of patrol dog in the car with the defendant when consent to search requested).

that search may therefore lawfully be used against him, and the order of the district court is affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge